UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____
                                            :
KYLE GUAY,                                  :     CASE NO. 1:20-CV-00736-AJ
                                            :
         Plaintiff,                         :
                                            :
v.                                          :
                                            :
SIG SAUER, INC.,                            :     JURY TRIAL DEMANDED
                                            :
         Defendant.                         :
                                            :
_____

### AMENDED COMPLAINT

         Plaintiff Kyle Guay, by counsel and for his Complaint seeking judgment against

defendant SIG Sauer, Inc. ("SIG"), alleges as follows:

### SUMMARY AND NATURE OF ACTION

1.       This action seeks actual, compensatory, and punitive damages, and equitable relief,

relating to defendant SIG Sauer, Inc.'s negligence, defective design, breach of warranties and

unfair and deceptive marketing practices regarding a semi-automatic gun: specifically, a striker-

fired, semi-automatic pistol known as the "P320" that has fired, without trigger pulls, on

numerous civilians and law enforcement agents across the nation for the last four years at least.

2.       Guay (pronounced "gway"), a resident of New Hampshire, purchased a SIG

Sauer P320 on December 17, 2016.  On the night of January 28, 2020, he was carrying

his P320 in a SIG-manufactured, outside-the-waistband P250 model holster while

walking his dogs.  Upon returning home, he proceeded to remove the holster from his

waistband with the firearm still concealed in the SIG-manufactured holster.

3.       As soon as he took hold of the holster and moved it so that the barrel would be

facing backwards when he removed the holster, the P320 fired and hit him in his right

thigh without him ever touching the trigger.  The hollow point bullet it discharged left a

gaping wound in his thigh, caused nerve damage, and left pieces of the blown-apart holster across the floor.

4.      Hillsboro police responded and noted, among other things, historical problems with the trigger assembly of the P320, finding that the gun went off "inside the holster," as stated by plaintiff Guay.  The Hillsboro police further noted that "there is no reason or evidence to suggest that [Guay] negligently, [or] purposely discharged the firearm into his own leg."

5.      Guay's P320 should not have discharged without the trigger being pulled, holstered or un-holstered.  In its "Safety Without Compromise" marketing materials for the P320, SIG states:

SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

6.      Despite this warranty, which SIG has made for the last several years to the present day, the weapon fired without the trigger being pulled.  SIG, further, illegally attempted to modify and/or disclaim the warranty more than six months after Guay's purchase by means of:  (i) a benign-sounding "Voluntary Upgrade Program" announced in August 2017 discussed below, and (ii) substantial changes to the P320 product manual describing what events can make the gun fire without a trigger pull, including "vibration."

7.      Despite clear evidence of serious safety issues with the P320, as demonstrated by the Voluntary Upgrade Program and warranty modifications, SIG nevertheless continued to affirm

the safety of the P320 as originally designed.  This is the version that fired on, and hit, Guay without a trigger pull on January 20, 2020, simply when he moved the holster it was in:

**SIG SAUER, Inc. – P320® Voluntary Upgrade Program**

Is my P320 safe in its current configuration?
Yes. The P320 meets and exceeds all US safety standards. However, mechanical safeties are designed to augment, not replace safe handling practices. Careless and improper handling of any firearm can result in an unintentional discharge.

## JURISDICTION AND VENUE

8.      The Court has federal question jurisdiction over the case.  It involves a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*  The Court has supplemental jurisdiction over Guay's state law claims pursuant to 28 U.S.C. § 1367(a) because they are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

9.      The claims asserted in this action arose within this district and the alleged damage occurred in this district. Venue is therefore proper pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391(b)(2) and (3).

## PARTIES

10.     The plaintiff Kyle Guay resides at 23 Spring Street, Hillsborough, New Hampshire 03244.  Guay is a 32-year-old resident of New Hampshire who is allowed to carry weapons concealed and has substantial firearms experience.  He has suffered severe physical injury and and mental trauma as a direct and proximate result of the negligence and breach of warranties and deceptive marketing practices of SIG.

11.     The defendant Sig Sauer, Inc. is a foreign profit corporation with a principal office address of 72 Pease Boulevard, Newington, New Hampshire 03801.  SIG Sauer, Inc. (SIG) is a Delaware corporation that designs and manufactures firearms for military and commercial (law enforcement and civilians) markets throughout the United States, and internationally.  It markets

and sells its products directly and through dealers.  SIG was formerly known as SIGARMS, Inc. and changed its name to SIG Sauer, Inc. in October 2007.

## ALLEGATIONS

### A.    Incident Background

12.    On the night of January 28, 2020, Guay was carrying his P320 in a SIG-manufactured, outside-the-waistband P250 holster while walking his dogs.  Upon returning home, he began to remove the holster from his belt with the firearm still fully seated in the SIG holster.

13.    As soon as he took hold of the holster and moved it so that the barrel would be facing backwards when he removed it from his waistband, the P320 fired and hit him in his right thigh without the trigger being pulled.

14.    The hollow point bullet it discharged left a gaping wound in his thigh and pieces of the holster across the floor where he lay.

15.    Hillsboro police responded and noted, among other things, historical problems with the trigger assembly of the P320, finding that the firearm went off "inside the holster," as stated by plaintiff Guay.

16.    The Hillsboro police further noted that "there is no reason or evidence to suggest that [Guay] negligently, [or] purposely discharged the firearm into his own leg."

17.    The incident has resulted in physical harm and related trauma to Guay, who was given pain-killing narcotics to deal with the injury and function on a day-to-day basis.  Guay was forced to stop taking the painkillers days later because they gave him a "crawling out of skin" sensation and reaction.  He continues to be prescribed a significant amount of sleep medications, and frequently wakes up sweating with night terrors about the incident and the wound itself.  He has suffered numbness, maceration of leg tissue and muscle, and metallic remnants of the discharged bullet in his leg.

**B.**    <u>**SIG'S Marketing of the P320 Pistol**</u>

18.    Years before the incident occurred in January 2020, through and including the date of Guay's December 2016 purchase, SIG expressly warranted that the weapon could not fire without a trigger pull.



**SAFETY WITHOUT COMPROMISE**

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

19.    In additional marketing material, under the heading "Striker Safety," SIG further states: the Striker Safety "[p]revents the striker from being released unless the trigger is pulled":

**Striker Safety:** Prevents the striker from re-leasing unless the trigger is pulled.

20.    At the same time, SIG SAUER contradictorily warned in the original owner's manual for the P320, on page 25, that the weapon could fire if dropped without the trigger being pulled: specifically, that it could fire if a round were chambered, i.e., inside the firing chamber of the weapon's slide when incurring an impact from the ground:



21.    Despite this warning, SIG expressly warranted not just that the P320 could not fire without a trigger pull, but that it **could not fire if dropped**,[1] in marketing documents regarding the P320.  The company was therefore stating two opposite things about the safety features of the P320, or lack thereof, at the same time:



---

[1]  Civilians and law enforcement agents carry guns like the P320 while traversing uneven terrain, including in situations where they may fall down, either accidentally or while engaged in an altercation or combat. SIG's own training academy in New Hampshire conducts courses and drills involving situations where the person carrying a gun falls to the ground resulting in the weapon incurring an impact.  It is not supposed to fire when that happens.  https://www.sigsaueracademy.com/productdisplay/reflexive-shooting

22.     Upon information and belief, it is standard operating procedure for all U.S. law enforcement agencies, including the United States Secret Service, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as local and state police departments, to carry pistols with a chambered round. SIG was fully aware of this fact at the time it sold any and all P320 pistols to U.S.-based law enforcement agencies and departments.

23.     Likewise, it is widespread practice among civilians who conceal carry their pistols to have a round in the chamber.  This practice does not violate black letter rules of firearm safety, as pistols should not be vulnerable to un-commanded discharges under any circumstances.[2]

24.     SIG was aware of the facts described in paragraphs 22 and 23 when it designed and manufactured the P320 in 2014 or earlier.

25.     SIG's advertising regarding the P320 has stressed the military and law-enforcement lineage of their firearms and focuses on highlighting the military/police usage, the modularity, the safety, and the functionality to everyone.

26.     Not only are military and law enforcement sales a source of profit for SIG, but military associations are also a powerful marketing tool that SIG uses to spur consumer sales such as to plaintiff Guay in December 2016:

---

[2]  End users carry their weapons with a round chambered to avoid being disadvantaged in a high-stress, live shooter scenario in which racking the slide back – assuming the user had the presence of mind to do it at all—would take extra time, thereby exposing the law enforcement agent or civilian to being shot first. https://www.thetruthaboutguns.com/round-in-the-chamber/





27.    As demonstrated in the above marketing materials, SIG advertised that the P320 would function in a safe manner.  Not only were these representations contained within SIG's advertisements, packaging, package inserts and website, but they were also delivered to retailers in the form of marketing materials and specifications which were reprinted verbatim and made available to consumers.

28.     The advertising and continued claims of safety led Guay to purchase the P320 without knowledge of its dangers.

29.     At all times relevant to this Complaint, SIG had a duty to disclose that the P320 suffered from any dangerous safety defect.

30.     Instead of disclosing its safety defects in numerous marketing materials – or on the packaging of the P320 – Sig decided to conceal them from purchasers such as Guay, causing him to purchase the P320 when he otherwise would not have.

**C.     Design of the P320 and August 2017 "Voluntary Upgrade Program"**

31.     The P320 is the first striker-fired pistol SIG ever manufactured.  SIG assembled it using the same frame and fire control unit from an earlier hammer-fired SIG model, the P250.

32.     A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user to cock the gun.

32a.    Rather, an internal "striker" is held back under spring pressure inside the gun like a crossbow.  Once the slide is racked backward, the weapon is internally cocked and ready to fire and in "condition red" or "duty ready" condition.  The striker is now under significant spring tension to move forward to impact the round's primer to fire the bullet, and is held back only by the weapon's sear.  In this illustrative photo of a striker-fired pistol, the striker in red is held back by the sear in blue:

striker



sear

33.    In early 2016, while competing for a $580,000,000 contract to supply the United States Army with a new service pistol in 2016, SIG's prototype P320s exhibited 200 malfunctions or more during Army testing.  These defects included failure to eject spent casings, firing upon impact with the ground, and not firing.

34.    In or around April 2016, the Department of Defense (DOD) notified SIG of many malfunctions with the P320.  It demanded that SIG fix all design problems associated with the P320.

35.    In early 2016, SIG was also warned by a Florida police department, and others, that the P320 was capable of firing without a trigger pull.

36.    SIG decided not to tell the public about the 2016 DOD and other law enforcement agency warnings about defects with the P320.

37.    As early as 2016, if not years before, members of SIG's management and design teams began investigating defective discharge events.

38.     These investigations involved SIG employees visiting local law enforcement agencies reporting defective discharge events, and taking the weapons to New Hampshire for in-house "testing."  These tests typically consisted of firing rounds through the weapon at issue and declaring it to be fine.  In each case, this in-house testing destroyed the integrity of the weapon in its immediate post-accident condition.

39.     However, rather than seek to learn the real facts and details surrounding the dangerous propensity of the P320 firearm to fire un-commanded, SIG's upper-level management actively avoided learning the details of defective discharge events.  It instead worked, where possible, with some law enforcement departments to theorize implausible reasons why P320s were discharging without trigger pulls, including that "keys," "artifacts," "seatbelt buckles," and clothing articles, among others, were getting into the holsters and pulling the triggers.

40.     For example, in one email exchange between a SIG in-house lawyer and a Roscommon, Michigan, law enforcement agent in 2016, the SIG lawyer recounts a patrol officer stating on a bodycam video (after a defective discharge inside a patrol car):  "[T]ell me how a gun would fire still in the holster."  The lawyer also states in the email that he told a sergeant of the Roscommon Department that he "did not want to see anything they did not want me to see."

41.     After relating in the email that the P320 at issue discharged simply when the officer "started to stand" to get out of his car, SIG's in-house lawyer noted that the empty casing of the discharged round had not ejected, as it should have.  SIG and/or the Roscommon Department later claimed that a "seat belt buckle" somehow found its way inside the officer's holster, got inside the weapon's trigger guard, wrapped itself around the trigger, and pulled the trigger.

42.     However, the bodycam video shows the seat belt buckle in its normal retracted position in four separate frames.  The officer in question, moreover, was not wearing his seatbelt at the time of the discharge, and at no time blames it for causing the discharge.  He instead expresses shock and disbelief that the weapon fired in the holster merely when he moved to get out of the car:



| OFFICER: | [Officer rises to exit car, gunshot] |
|---|---|
| | What the hell? |
| | You explain to me how a gun goes off getting out of the car. |
| 2D OFFICER: | Huh.  What? |
| OFFICER: | Yea.  Holy s***. |
| 2D OFFICER: | No s***. |
| OFFICER: | Holy s***. |
| 2D OFFICER: | Scare the s*** out of you huh? |
| OFFICER: | Something hit my leg.  I don't know if I'm shot or what but you're my witness man.  I'm glad I got a witness.  Look at that you tell me how that goes off? |
| 2D OFFICER: | I don't know man.  That's bizarre.  You were just standing up and it went off. |
| OFFICER: | Yea, I was just getting out of the car. |
| 2D OFFICER: | Good thing it didn't get your fr***** or hand.  I'm not a big fan of Glocks. |

| | |
|---|---|
| OFFICER: | It's not a Glock it's a SIG. |
| 2D OFFICER: | Oh, it is. |
| OFFICER: | I am going to take this out and unload the damn thing.  It even wrapped another one in.  Oh no, it didn't.  That's a discharged round. |
| OFFICER: | Can I get your name? |
| 2D OFFICER: | Yea. |
| OFFICER: | Whoa.  That could have ruined my whole goddamned day.  Imagine explaining that to the sheriff. |
| 2D OFFICER: | Yea. |
| OFFICER: | I'm so glad you're here man. |
| OFFICER: | Can you imagine having to explain that to the sheriff. |
| 2D OFFICER: | Did you get a concussion. |
| OFFICER: | Yeah, I got a sting.  Well it blew bottom of holster out of something black went flying out. |
| OFFICER: | Well at least I got my bodycam. |
| 2D OFFICER: | That surprised me. |
| OFFICER: | You thought you were surprised.  God****. |
| 2D OFFICER: | I've always worried about that. |
| OFFICER: | Glad nobody got hurt. |
| OFFICER: | I just for the life of me can't figure out how that went off. |
| 2D OFFICER: | Yea, because there's no, uh, your seatbelt wouldn't have hit that. |
| OFFICER: | No, the trigger was completely covered.  I don't know.  I honestly don't know.  Like I said, I'm glad you're my witness.  I'm going home and have a beer. |
| 2D OFFICER: | I would too. |
| OFFICER: | Thanks man. |

43.    The disconnect between SIG's public representations that the P320 was safe, and its

private knowledge that it was not, showed a conscious disregard for the lives and safety of

members of the public and law enforcement officers.  At all times relevant to this Complaint, SIG employed a skillful public relations campaign, internet marketing, and in-person reassurances of the P320's alleged safety to end users, which was designed to maximize revenue at the expense of human safety.

44.     While and most likely before competing for the $580,000,000 Army contract in 2016 and 2017, SIG privately struggled, unsuccessfully, to find an engineering re-design solution that would prevent the commercial version of the P320 from unintentionally firing on civilians and law enforcement officers without trigger pulls, even upon mere rotational movement of the human body.

45.     On August 4, 2017, a Stamford, Connecticut, SWAT officer sued SIG in United States District Court for the District of Connecticut for damages relating to a drop fire that shot him in the knee when his holstered P320 fell from a distance of less than three feet and fired.  The Stamford discharge resulted in a flood of national negative media publicity and attention regarding the safety of the P320, including television and the internet.

46.     Four days later, SIG issued a press release stating that the P320 could fire without a trigger pull under certain conditions, including vibration, but "reaffirmed" the safety of the P320 to all end users:

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

15



PR Contact:
Jordan Hunter
SIG SAUER, Inc.
603-610-3293
jordan.hunter@sigsauer.com

FOR IMMEDIATE RELEASE

### SIG SAUER® Reaffirms Safety of P320® Pistol

*Striker-fired pistol exceeds safety standards of ANSI/SAAMI® and U.S. military testing*

**Newington, NH (August 4, 2017)** – In response to social media rumors questioning the safety of the P320 pistol, a variant of which was selected by the U.S. government as the U.S. Army's Modular Handgun System (MHS), SIG SAUER, Inc. has full confidence in the reliability, durability and safety of its striker-fired handgun platform. There have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date.

The P320 meets and exceeds all U.S. standards for safety, including the American National Standards Institute (ANSI) and Sporting Arms and Ammunition Manufacturers' Institute, Inc. (SAAMI), as well as rigorous testing protocols for global military and law enforcement agencies.

All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to not work as designed. This language is common to owner's manuals of major handgun manufacturers.

As a result, individual attempts to perform drop tests outside of professionally controlled environments should not be attempted.

"SIG SAUER is committed to producing only the finest products," said Ron Cohen, President and CEO of SIG SAUER. "Safety and reliability have been and always will be paramount to the SIG SAUER brand."

For more information on SIG SAUER, please visit us at sigsauer.com

Follow SIG SAUER on social media, including Facebook at facebook.com/sigsauerinc, Instagram at instagram.com/sigsauerinc, and YouTube at youtube.com/user/sigsauerinc.

**SIG SAUER, Inc.**

SIG SAUER, Inc. is The Complete Systems Provider™, leading the industry in American innovation, ingenuity, and manufacturing. SIG SAUER® brings a dedication to superior quality, ultimate reliability, and unmatched performance that has made it the brand of choice among many of the world's elite military, government and law enforcement units as well as responsible citizens. SIG SAUER offers a full array of products to meet any mission parameter, including handguns, rifles, ammunition, electro-optics, suppressors, ASP (Advanced Sport Pellet) airguns and training. The largest member of a worldwide business group of firearms manufacturers that includes SIG SAUER GmbH & Co. KG in Germany and Swiss Arms AG in

**SIG 000177**

47.     SIG's claim was inaccurate and intentionally misleading because its new warnings regarding the capability of the P320 to fire without a trigger pull, upon "shock" or "vibration," were not "common to owner's manuals of major handgun manufacturers."

48.     On August 14, 2017, SIG announced a Voluntary Upgrade Program for the P320.  The VU Program was created for the stated purpose of "reduc[ing] the physical weight of the trigger, sear, and striker while additionally adding a mechanical "disconnector," allegedly simply to make the P320 "better" than it already was.  Many of these design changes to the P320, as SIG stated, had "nothing to do with drop safety":



https://www.sigsauer.com/support/p320-voluntary-upgrade/



49.     In reality, SIG's VU Program was intended to re-design and correct the defective firing control unit within several hundred thousand P320s without admitting it.  To protect its corporate image, SIG continued to deny, both to law enforcement and the general public, any dangers in the original "non-upgraded" P320 such as the one that shot Guay in January, 2020.  SIG maintained that the P320 would not fire if its safeties were "fully functional" and were "without broken or missing parts":



50.     Indeed, at the time the VU Program was announced, SIG had just recently obtained the $580,000,000 Army contract.  A mandatory recall under these circumstances would have been a public relations disaster for the company, cost tens if not hundreds of millions of dollars in mandatory recall expenses, and would have caused irreparable damages to its brand.

51.     In the words of SIG, these VU Program changes represented an "alternate design" of the P320.  SIG declined to label the VU Program a "recall" and expressly stated that all P320s in circulation were safe.

52.     Consistent with most consumer returns, only about 20% of P320 owners ever mailed their guns back for the "upgrades," thus saving SIG tens of millions of dollars in labor, parts and shipping, and leaving hundreds of thousands of dangerous P320s still in circulation in the United States.

53.     In fact, when the VU Program was announced in August of 2017, days after the

Stamford federal lawsuit, SIG had actual knowledge of numerous defects with the firing control

unit in the P320 for approximately two years, if not longer.

54.     On May 10, 2017, the DOD submitted an urgent Engineering Change Proposal for the

prototype of the military version of the P320.  Though couched as a product "improvement to

enhance performance," the Proposal demanded that the P320's internal firing control unit be

replaced, including the receiver subassembly, the sear group subassembly, the trigger, the

sear, the striker subassembly, and the firing pin striker.  SIG complied and made all requested

engineering changes.

55.     However, to save approximately $50-100 million in recall expenses, it assured end users

of approximately 500,000 commercial versions of the P320, in the hands of United States law

enforcement agents and civilians, including Guay, that they were all still safe, thereby exposing

him and others to severe bodily harm, emotional trauma, and sudden death.

56.     SIG has never recalled the P320 despite having recalled other of its products known to

have defects.  SIG's former German parent company, SIG GMBH, took the benefit of $35

million in financial losses relating to the VU program, describing it in tax filings with the German

government as a "recall" in America, illustrating the deceptive nature of the VU Program.

**D.     P320 Manual Changes.**

57.     Approximately eight months after January of 2017, when the Connecticut SWAT

member was shot, SIG removed the warning on page 25 from the user manual regarding a

chambered round, and replaced it with the following dramatically different language:

 All SIG SAUER pistols incorporate effective mechanical safeties to ensure they only fire when the trigger is pressed. However, like any mechanical device, exposure to acute conditions (e.g. shock, vibration, heavy or repeated drops) may have a negative effect on these safety mechanisms and cause them to fail to work as designed. After suspected exposure to these conditions, have the firearm checked by a certified armorer before using. Mechanical safeties are designed to augment, and not replace safe handling practices.**Careless and improper handling of any firearm can result in unintentional discharge.**

(emphasis in original).

58.     SIG had never before represented that mere "vibration" or "shock" could cause the weapon to discharge; this statement was irreconcilable with its original warranty that the weapon would only fire if the trigger were pulled.

59.     SIG had also expressly represented since the P320's manufacture and distribution into the stream of commerce in 2014 that the weapon possessed a "robust safety system."

60.     In fact, SIG's original design and manufacture of the P320 in 2014, or earlier, rendered the weapon unreasonably dangerous for its intended uses, and for any foreseeable uses and accidents involving its intended uses, including any normal carrying, holstering, un-holstering, or rough handling in any altercation or combat, at the time Guay purchased his P320 in December 2016.

61.     Specifically, it possessed an inadequate sear-striker connection (even after implementing a "voluntary upgrade" program for the gun), an inadequate internal striker safety, too much horizontal and vertical "play" between internal parts inside the slide, a slide cap that was too long, and no external or tabbed trigger safety.

**E.**     **Other Substantially Similar or Identical Defective Discharges of the P320.**

62.     Before it introduced the P320 into the stream of commerce in the United States in 2014, SIG was aware of defective discharges without a trigger pull, many of which pre-dated the December, 2016, sale to Guay.

63.     Upon information and belief, there have been many prior incidents of defective discharges involving the P320 where the gun has discharged without the trigger being pulled (whether involving the P320 in its original configuration, or the re-designed or "upgraded" version).  The P320 has defectively discharged (both while in battery and out-of-battery) while the weapon was merely being handled or moved, while it was being holstered or un-holstered, and when the weapon was accidentally dropped.[3]

---

[3]  A pistol such as the P320 is in battery when it is ready to fire with the slide properly positioned in alignment with the frame over which it rests.  An "out-of-battery" discharge occurs when the slide is not in proper alignment with the weapon's frame.  Photo shows a pistol in out-of-battery state.



64.     For example, in February of 2016, a fully-holstered P320 discharged without a trigger pull inside a Roscommon, Michigan, police officer's vehicle when the officer moved to exit the vehicle during a snowstorm.  The incident was captured on the officer's body cam video (fn. 3 above) and shows that no object entered his holster at any time.

65.     In 2016, the Surprise, Arizona, police department complained to SIG of two separate incidents of P320s firing without trigger pulls.

66.     Despite outstanding discovery requests in a civil action against SIG regarding defects with the P320 in the United States District Court for the Eastern District of Virginia in 2018, *Vadnais v. SIG Sauer, Inc.*, 1:18-cv-00540 (EDVA 2018), these three incidents described in Paragraphs 64 and 65 herein were not disclosed by SIG, until the last day of discovery.

67.     In October of 2016, a P320 fired un-commanded on retired NYPD officer Thomas Frankenberry in South Carolina, severely injuring him.  The spent casing did not eject.

68.     In November of 2016, a P320 fired un-commanded on an officer in Holmes Beach, Florida, striking him in his leg.

69.     In 2017, a sheriff's deputy in Michigan accidentally discharged a SIG Sauer pistol, striking a schoolteacher in the neck.

70.     On January 5, 2017, a P320 shot a Stamford SWAT team member in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG's express representations that the weapon is drop safe, cannot fire without a trigger pull, and does not require a safety to be drop safe.

71.     On February 28, 2017, a P320 accidentally discharged while in use by the University of Cincinnati Police Department.

72.     On June 14, 2017, a P320 accidentally discharged in Wilsonville, Oregon.

73.     On June 20, 2017, a P320 accidentally discharged while in use by the Howell Township, NJ, Police Department.

74.     In June of 2017, SIG shipped approximately 800 P320s to the Loudoun County Sheriff's Department in Virginia, privately assuring Sheriff David Chapman that the by-then known problems with the weapon would be fixed, but stating that for the time being it had to deal with the weapon as currently manufactured and designed.  Three P320s within this shipment later fired without trigger pulls on three deputy sheriffs, severely injuring them. [4]

75.     On July 28, 2017, a P320 accidentally discharged in Tarrant County, Texas.

76.     On August 7, 2017, SIG's CEO, Ron Cohen, stated in a press release that:  "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."  This statement was not true.  In fact, at the time it was issued, SIG had direct knowledge that Officer Vincent Sheperis in Connecticut had been shot by a drop fire with the commercial version of the P320 approximately eight months earlier, as well as several other defective discharges of the P320 before that date.

77.     As noted, on August 8, 2017, SIG announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

78.     This statement was also false and intentionally misleading as there are no United States federal government standards for gun safety, a fact well known to SIG when it issued this press release.[5]

79.     SIG's VU program, as noted, was presented to the public as purely optional, not urgent, and not mandatory, offering to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnector component, and an improved sear to prevent accidental discharges.

---

[4]  Both a non-upgraded and "upgraded" re-designed versions of these P320s later fired un-commanded on and hit at least three Loudoun County deputy sheriffs in 2018 and 2019.

[5]  No federal agency oversees how firearms are designed or built.  Congress exempted firearms from any federal regulation when it created the Consumer Product Safety Commission in 1972, due to Second Amendment concerns.

80.     On August 9, 2017, the police chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

81.     In October of 2017, a P320 accidentally discharged in Georgia when an officer fell to the ground in pursuit of a suspect.  His weapon was holstered and fired simply when he struck the ground.

82.     On November 12, 2017, a P320 accidentally discharged in Tyler, Texas.

83.     In January 2018, upon information and belief, a P320 accidentally discharged in Dallas County, Texas.

84.     On February 7, 2018, Loudoun County, Virginia, deputy sheriff Marcie Vadnais's P320 fired on her un-commanded severing her right femur causing catastrophic skeletal injury, deformity, four general anesthesia surgeries, severe emotional distress, and related trauma, ending her career.  Upon CAT scanning her P320, it was found to have both a product and manufacturing defect:  crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

85.     Months later in April of 2018, SIG issued a **second** "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

86.     In May of 2018, civilian Gunter Walker reported to SIG that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

87.     In June of 2018, a Williams County, Ohio, officer reported that his P320 discharged twice in one moment as he was merely attempting to move the slide backward.  One round grazed the officer's arm; the other blew through his patrol car's driver's side door.

88.     In May of 2018, a Rancho Cucamonga, California, officer reported that his "upgraded" P320 fired un-commanded while he was merely walking inside his department locker room; the casing of the round did not eject.

89.     In October of 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

90.     In October of 2018, firearms expert and retired law enforcement officer Stephen Mayes' P320 fired on him un-commanded while seated in its holster, causing severe injury to his right leg.

91.     In December of 2018, civilian Robert Lang's P320 fired on him un-commanded, causing severe tunneling wounds to his right leg.

92.     On May 19, 2019, the upgraded P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual Mayfair event near Harvard Square.  The round struck a metal plate affixed to his cellphone case, deflected into a SWAT gear bag, and came to rest in a ballistic helmet, narrowly missing everyone.  The casing of the round did not eject. Lieutenant Ahern, an active responder to the Boston Marathon Bombings in April 2013, is a SIG-certified armorer on the P320 with significant weapons experience. [6]

93.     On July 23, 2019, an upgraded P320 fired un-commanded on Officer Walter Collette, Jr. of the Somerville, Massachusetts, police department, hitting him in his leg and causing substantial injuries to his leg.  The next day, an upgraded P320 fired un-commanded on a Homeland Security Agent at a firing range in the Bronx, New York.

94.     In August of 2019, a Philadelphia transit officer's upgraded P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway.  The incident was captured on video, showing an "upgraded" P320 firing without the gun ever being touched, while it was

---

[6]  According to SIG Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty**.**  Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability.  Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty.  Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.sigsaueracademy.com/course/armorer-certification

seated inside its holster.  The officer involved (who noted that the round almost hit a bystander) returned to duty the next day fully exonerated and with no discipline.

95.     The Philadelphia transit authority replaced all SIG P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull.  The officer, Craig Jacklyn, later stated:

> This weapon is a hazard.  I actually spoke with a lawyer for my situation.  Although no one was hurt...someone could have been killed.  I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer.  The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry.  Everything that I've told you is documented through 2 Investigative Services . . . Philadelphia Police Firearms Investigative Unit/ Officer Involved Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit.  There is station video footage/ body worn camera footage as well.

96.     On September 3, 2019, another upgraded and re-designed P320 in use by the Loudoun County, Virginia, sheriff's office fired un-commanded on another Loudoun County deputy sheriff, Carl Costello, hitting him in his leg.

97.     On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, police department, was shot by his P320 without a trigger pull.  The round caused massive and life-changing injuries to Officer Desrosiers.  The spent casing of the round did not eject.

98.     On October 11, 2019, a P320 fired un-commanded on Veterans Affairs police officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon.  An inspection determined that the spent casing did not eject.

99.     The Kneski discharge was investigated by Major Peter J. Villani of the United States Veterans Affairs police agency, also a SIG-certified armorer.  In his report, he noted the following:

> After reviewing the Officer's sidearm, it was noted that the P-320 came from Sig Sauer to the distributor prior to the point of sale already with the "upgrade" completed.  The sidearm had approximately 100 rounds through it since purchased.

Upon further examination of the internal parts of the frame module, I noticed that the foot of the striker that catches the [sear] has noticeable side to side and up and down movement within its channel along with upward movement of the slide from the frame. Also, the edge of the striker foot which has a height thickness of approximately 2mm, is only making contact with approximately .25 of a mm of the leading edge only of the disconnector hook.  Since the striker has been changed with a lighter weight version during the "upgrade program", it is quite possible that any abrupt movement or twisting of the P-320 while holstered, could cause the foot of the striker to disengage itself from the disconnector hook on its own since there is so little contact between the striker foot and the [sear].

100.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California, police department as he was getting ready for work.  As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

101.    The holster was a Safariland level three holster with the hood cover up securing the pistol.  The round blew out the bottom of the holster, impacted the locker room floor, and missed both Officer Gardette and a fellow officer by inches as it ricocheted into a locker door.

102.    On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, police department, as he was in the process of putting his duty belt on.

102a.   On April 15, 2020, a P320 fired un-commanded on Officer Nathan Henyan in Washington state while fully seated in its holster.  The bullet entered his hip area and tunneled down the left side of his leg, exiting the rear of his thigh.

103.    In June of 2020, a P320 X-Carry fired un-commanded on a Pasco County, Florida officer, severely wounding him in his right leg.  This incident was the third un-commanded discharge experienced by Pasco County officers since 2019.

104.    In June of 2020, a P320 fired un-commanded on a civilian in Missouri while fully seated in its holster, causing substantial damage to the holster and resulting in a broken bone to the civilian's foot.

105.    Upon information and belief, employees at SIG's own training academy in New

Hampshire have knowledge of defective discharges causing injury that occurred in both 2016

and 2017.

106.    In an interview in 2013, just before the P320 came to market, SIG's former Chief

Financial Officer, Timothy Scullin, noted that SIG's revenue had risen approximately 1,400

percent from 2012 to 2013.  He further stated that Sig Sauer's growth had outpaced the

firearms' industry's growth by "two or three times."  When asked what were some of the biggest

professional challenges in his career with SIG, CFO Scullin stated:

> At SIG, to grow this fast, people get really challenged.  When you're growing 70 to 80
> percent in a year, all the systems get stretched, and the people really get stretched.  You
> have to be able to manage multiple tasks in a very fast environment, and in an
> environment that's highly regulated, so you can't mess up, otherwise you get shut down.
> It just creates a tremendous amount of stress on the people in the system.  But we've
> got people that have risen to the challenge.

107.    Upon information and belief, the "stress" Scullin noted on SIG's employees included

verbal and even physical harassment to get product "out the door" as quickly as possible

regardless of quality control and safety concerns.

### COUNT I

### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a))

108.    Guay incorporates the preceding allegations by reference.

109.    The SIG P320 is a consumer product as defined in 15 U.S.C. § 2301(1).

110.    Plaintiff Guay is a consumer as defined in 15 U.S.C. § 2301(3).

111.    At all relevant times, SIG was a supplier and warrantor as defined in 15 U.S.C. § 2301(4)

and (5).

112.    In connection with the sale of the P320 Guay purchased in December of 2016, SIG

issued written warranties as defined in 15 U.S.C. § 2301(6), which expressly warranted that the

P320 would not fire un-commanded, i.e., without a trigger pull.  In fact, Guay's P320 was

capable of firing, and did fire, without a trigger pull, contrary to SIG's warranties.

113.    SIG breached the express warranties it made to Guay stating that the P320 was safe for its intended and foreseeable uses and particular purposes.

114.    After Guay's purchase of the P320, SIG attempted to modify and/or disclaim the warranties it had made regarding the safety of the pistol by stating that "vibration," among other factors, could make the P320 fire without a trigger pull.

115.    SIG's attempt to modify and/or disclaim its prior warranties regarding the safety of the P320, some eight months after Guay's purchase, violated section 2308(a) of the Magnuson-Moss Warranty Act (the Act).

116.    SIG's violation of the Act has been the direct and proximate cause of substantial economic and non-economic damages incurred by Guay.

## COUNT II

## (Negligence)

117.    Guay readopts and re-alleges all of the preceding paragraphs of this pleading as if fully set forth herein.

118.    At all relevant times, SIG owed Guay the duty to exercise reasonable care in designing the P320 weapon before selling the gun and placing it into the stream of commerce, so as to prevent the gun from firing upon him when he merely moved his holster.

119.    At all relevant times, SIG owed Guay the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing inside a holster, where the trigger cannot be pulled, before selling the gun and placing it into the stream of commerce.

120.    At all relevant times, SIG owed a duty to unambiguously warn consumers and/or intended users of the P320, including Guay, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use.

121.    Upon information and belief, SIG knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially

similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery, long before one of its P320s shot Guay in January of 2020.

122.     SIG breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

i.      By failing to use due care in designing and manufacturing the P320's firing and striker assembly so as to prevent un-commanded discharges;

ii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch to prevent un-commanded discharges;

iii.    By failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iv.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

v.     By negligently failing to unambiguously warn purchasers and end users of the gun, including Guay, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

vi.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vii.   By negligently failing to place a warning about mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer,

instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and

viii.   Other negligent acts and omissions to be developed in the course of discovery.

123.   SIG knew, or should have known, that exposing users to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries to such users, up to and including sudden death.

124.   The gun's defective condition was not visible, and Guay was not capable of realizing the dangerous condition, nor could he have discovered the dangerous condition even upon performing a reasonable inspection of the same.

125.   SIG' negligence as alleged in this Count directly and proximately caused the January, 2020, un-commanded discharge and Guay's injuries resulting from the accident.

126.   As a direct and proximate result of the breaches set forth in this Count, Guay suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness and trauma associated with the same.

## COUNT III

### (Breach of Implied Warranty of Merchantability)

127.   Guay readopts and re-alleges all the preceding paragraphs of this pleading as if fully set forth herein.

128.   At all relevant times, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Guay's injuries.

129.   SIG knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes (which included being "vibrated" and handled while situated within and without a holster) and all other reasonably foreseeable uses.

130.   At all relevant times, Guay used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of SIG.  SIG

breached the above-referenced implied warranties as to the gun because, at the time it left SIG's possession, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary and reasonably foreseeable purposes for which it was intended and its reasonably foreseeable misuses by virtue of:

      i.      Failing to use due care in designing and manufacturing the P320's internal components, including its sear-striker connection, and by omitting a mechanical disconnect switch, so as to prevent un-commanded discharges;

      ii.      Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

      iii.      Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

      iv.      Negligently failing to unambiguously warn purchasers and end users of the gun, including Guay, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

      v.      Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun; and

      vi.      Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges.

131.     Guay, as the end user of the gun, was a person who would foreseeably be injured by SIG's breach of the implied warranty referenced in this Count and SIG's breach of the warranty

of merchantability as alleged herein, which breaches directly and proximately caused the accident on January 28, 2020, and Guay's claimed injuries.

132.    As a direct and proximate result of the breaches set forth in this Count, Guay suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness and trauma associated with the same.

<div align="center">

**COUNT IV**

**(Breach of Express Warranty)**

</div>

133.    Guay readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

134.    At all times material hereto, SIG was in the business of marketing, selling, and distributing weapons, including the gun causing Guay's injuries. Upon information and belief, SIG knew, or had reason to know, that the gun would be situated in holsters that would need to be removed from end users' waistbands at the time SIG sold the gun, and that the purchaser was in fact relying on SIG's skill, judgment, and implied warranty of the gun's fitness for that particular purpose.

135.    SIG expressly warranted that the P320 would not fire unless the trigger was pulled.

136.    At all relevant times, Guay used the gun in its intended manner, and for its intended purpose, and reasonably relied on the skill, judgment and implied warranty of SIG in using and handling the gun and its SIG-issued holster.

137.    SIG breached the above-referenced express warranty as to the gun in that it fired without a trigger pull and was unreasonably dangerous at the time it left SIG's possession by virtue of:

      i.    Failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

ii.      Failing to issue a mandatory recall of the P320 as SIG had done in the past with other defective products;

iii.     Failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally as described above;

iv.     Negligently failing to unambiguously and conspicuously warn purchasers and end users of the gun, including Guay, of said defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, about which it knew or should have known through the exercise of ordinary care;

v.     Failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge accidentally while in the possession of SIG, and during which times employees, servants or agents of SIG had an opportunity to inspect, service and work on the gun;

vi.     Negligently failing to place a warning about the danger of mere "vibration" of the gun in a conspicuous manner, such as on its case, which could be easily understood by a consumer, instead of relying on changing the bottom of page 25 of the user manual for the gun after several incidents of accidental discharges; and

vii.     Expressly warranting that the gun would not fire unless the trigger was pulled.

138.    As a direct and proximate result of the breaches set forth in this Count, Guay suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness and trauma associated with the same.

## COUNT V

### (Intentional Infliction of Emotional Distress)

139.    Guay readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

140.    Upon information and belief, SIG had knowledge of serious defects in the commercial version of the P320 gun more than three years, if not longer, before Guay was shot in January 2020.

141.    Despite having such knowledge, it failed to issue a mandatory recall of the gun despite the ability to do so, which would have prevented the severe injury to Guay.

142.    Had SIG acted responsibly and repaired the defects in the commercial version of the P320 before December of 2016, Guay never would have been shot.  The round discharged from his weapon easily could have taken his life, that of any bystander near him at the time of discharge, or his dogs.

143.    SIG acted, and failed to act, so as to endanger the safety and lives of end users of its products because it sought to save millions in repair costs, by failing to institute a mandatory recall as it had done for other defective SIG weapons, choosing instead to implement a woefully inadequate "voluntary upgrade."

144.    SIG's conduct in this matter as described herein was extreme and outrageous such as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.

145.    Through SIG's extreme and outrageous conduct, SIG intentionally or recklessly caused Guay severe emotional distress, as well as severe physical injury.

146.    As a direct and proximate result of the breaches set forth in this Count, Guay suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness and trauma associated with the same.

## COUNT VI

### (Negligent Infliction of Emotional Distress)

147.    Guay readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

148.    SIG owed a duty to the plaintiff, and end users of the P320 generally, to ensure that the P320 was free of design and/or manufacturing defects that could cause the gun to discharge without the trigger being pulled.  SIG further owed a duty to the plaintiff, and end users of the P320 generally, to notify them of such defects in the P320 that could endanger them.   In addition, SIG owed a duty to issue a mandatory recall of P320 guns, given SIG's knowledge of design and manufacturing defects imperiling the lives and safety of end users.

149.    SIG breached each its duties owed to the plaintiff, foreseeably causing the plaintiff serious mental and emotional harm accompanied by objective physical symptoms.

150.    As a direct and proximate result of the breaches set forth in this Count, Guay suffered severe physical injury, nightmares, mental anguish, inconvenience, traumatic stress, sleeplessness, anxiety and trauma associated with the same.

## COUNT VII

### (**Violation of New Hampshire Revised Statutes Annotated § 358-A-1 *et seq*.**)

151.    Guay readopts and re-alleges all the preceding paragraphs of this Complaint as if fully set forth herein.

152.    By its actions, described in detail in this Complaint, defendant SIG has engaged in unfair and deceptive acts in violation of sections 358-A:2(V) and (VII) of New Hampshire's Consumer Protection Act.

153.    SIG's actions have been willful and knowing, and the direct and proximate cause of substantial damages to plaintiff Guay, entitling Guay to mandatory doubling and discretionary trebling of his actual damages, as well as his reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1.    Assume jurisdiction over this case;

2.    Empanel a jury, and after trial, find the defendant liable for violation of the Magnuson-Moss Warranty Act, negligence, breach of implied warranty of

merchantability, breach of express warranty, intentional infliction of emotional distress, and violation of N.H.R.S.A. 358-A;

3.    Award the plaintiff damages for his economic losses, including but not limited to damages for lost wages, lost earning capacity, as well as medical, life care and nursing expenses;

4.    Award the plaintiff compensatory damages, including but not limited to damages for physical injury, pain and suffering, emotional distress, humiliation, inconvenience and loss of enjoyment of life;

5.    Double or treble the award of the plaintiff of his actual damages pursuant to RSA 358-A:10;

6.    Award plaintiff costs and reasonable attorneys' fees in bringing this action;

7.    Order defendant to issue a recall notice or other enhanced, unambiguous warnings to all purchasers of the P320 stating that the weapon can fire without a trigger pull;

8.    Retain jurisdiction over this case until defendant has complied with all orders of the Court; and

9.    Award such other relief as the Court deems appropriate.

    The plaintiff demands a trial by jury on all counts.

<div style="margin-left:40%">

Respectfully submitted,
PLAINTIFF
KYLE GUAY

</div>

Dated:  July 13, 2020      By:    /s/ Jeffrey S. Bagnell
                                                      Jeffrey S. Bagnell, CT Bar #18983
                                                      (Pro Hac Vice admission to be petitioned)
                                                      Jeffrey S. Bagnell, Esq., LLC
                                                      55 Greens Farms Road, #200-60
                                                      Westport, Connecticut 06880
                                                      (203) 984-8820
                                                      (203) 255-4454 (fax)
                                                      jeff@bagnell-law.com
                                                      Counsel for Plaintiff

Dated:  July 13, 2020      By:     /s/ Benjamin T. King
                                                      Benjamin T. King, NH Bar #12888
                                                      Douglas, Leonard & Garvey, P.C.
                                                      14 South Street, Suite 5
                                                      Concord, NH 03301
                                                      (603) 224-1988
                                                      (603) 229-1988 (fax)
                                                      benjamin@nhlawoffice.com
                                                      Counsel for Plaintiff