UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| _____ | : | |
| KYLE GUAY, | : | CIVIL ACTION NO.: |
| | : | 1:20CV00736(LM) |
| Plaintiff, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| SIG SAUER, INC. | : | |
| | : | |
| | : | |
| Defendant. | : | |
| _____ | : | APRIL 25, 2022 |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**I.    Summary**

Sig's Motion for Summary Judgment is premised entirely on the assumption that its

Daubert motions will be granted.   For the reasons Guay has previously stated in his

Memorandum in opposition to those motions, the Motion should be denied.  Guay has advanced

substantial evidence supporting his claims and is not relying on "pure conjecture" as Sig claims.

Def. Mem. Law, p. 8.  A rational jury could easily find in his favor.

Guay's experts' opinions are based on reliable methodology and sufficient data,

and the opinions are relevant to the issues in the case under Fed. R. Evid. 702.  Defendant

heavily relies on one unpublished opinion from a district court in South Carolina, *Frankenberry*

*v. Sig*, 4:2019cv02990 (D.S.C. 2022), in support of its Motions.  It does not mention, however,

that its virtually identical *Daubert* and summary judgment motions in *Vadnais v. Sig Sauer, Inc*.,

3:2018cv00605 (EDVA 2019), a case involving a holstered P320, were summarily denied from

the bench.  ("ORDER: For the reasons stated in open court, defendant's Motion for Summary Judgment [Dkt. No. 77] and Motion in Limine to Exclude Expert Testimony [Dk. No. 79] are DENIED") (Docket No. 110).  Sig's heavy reliance *Frankenberry,* a case involving an unholstered P320, is flawed for the reasons set forth below.

Hicks, a mechanical engineer with substantial firearms experience, has with sufficient basis opined that Guay's gun fired while fully seated in holster after reviewing CT scan images of the gun, the blown-up holster, up-close images of the surfaces of the striker foot and sear face inside its fire control unit, several other P320s that contained the same manufacturing defects, and the facts of the incident.  His opinion is consistent with that of the Hillsboro Police Department's own report on the incident.  He also reviewed evidence of numerous other P320's firing without a trigger pull, some of which have been captured on video or eye witnessed.

Villani, an armorer on the P320 - - *certified by Sig Sauer itself,*[1] has opined based on vast experience with firearms that Guay's P320, and numerous others he personally inspected, all possessed substantial manufacturing defects that reduce surface area contacts between critical internal components, which would allow the gun to discharge without a trigger pull upon imposition of inertial force.  This is hardly a novel or "unreliable" opinion given that Sig Sauer's *own August 4, 2017 press release* on the original version of the P320 states that mere "vibration" can make the gun safety mechanism fail.  (Ex. 1).  Contrary to what Sig claims in its memorandum, it is settled that:

> An expert witness can testify on the basis of his own experience alone. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 156 (1999) **("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience")**. "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably

---

[1]    It is notable that Sig's proffered expert in *Sig v. Bagnell, et al.*, Robert "Buzz" Miller is not even a certified armorer on the P320 as Villani is.  Sig nonetheless presents him to the Court as an expert witness in that case.

applied to the facts.  Ultimately, it is the reliability of the expert witness's opinion that the court evaluates in its role as gate keeper, not its credibility.

*Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 105 (1st Cir. 2020) (emphasis added).

Villani need not possess a degree in mechanical engineering, as Hicks does, to have extensive "specialized expertise" and knowledge in firearms and specifically the Sig P320 which the jury should be allowed to weigh.  Sig should be required tell the jury why it allegedly means nothing that he was certified by Sig as an armorer on the P320, why it should otherwise discount his extensive specialized knowledge and expertise regarding semi-automatic firearms, and all the real-world replication of the P320 firing on its own.  There simply is no peer reviewed literature on the P320's defect as it is relatively new.

So long as an expert's scientific testimony rests upon "'good grounds,' based on what is known," *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities, *id.* at 596, 113 S.Ct. 2786.

II.   **Factual Background**

In its brief "Statement of Undisputed Facts," in both its *Daubert* and summary judgment motion papers, Sig draws inferences in its own favor and omits record evidence unfavorable to its position.  It writes three times that Guay "shot himself" (as it claims virtually all P320 victims do), despite knowing that he claims that the P320 shot him while holstered, and that his claim is supported by three other witnesses and a detailed police report.  (Docket No. 26, p. 3). Similar to how Sig overstates the *Daubert* standard, this closing argument-like advocacy is not the summary judgment standard.  *See Morse v. Cloutier*, 869 F.3d 16, 22 (1st Cir. 2017) ("[s]ummary judgment is appropriate only when the record, read in the light most favorable to the nonmovant, presents no genuine issue as to any material fact and reflects the

movant's entitlement to judgment as a matter of law"), *citing* Fed. R. Civ. P. 56(a); *Schiffmann v. United States*, 811 F.3d 519, 512 (1st Cir. 2016)).

In its Statement, Sig omits the entirety of Guay's testimony that his P320 fired in its holster, as well as the responding officers' testimony and reports that Guay's P320 fired in its holster.  All evidence of numerous, substantially similar incidents of the P320 firing on its own in holsters, some caught on videotape and otherwise eye-witnessed, is ignored.  Omitting the testimony of three witnesses supporting Guay's claim, Sig selectively recites the testimony of one, late-arriving EMS.  She testified that Guay told her that he had withdrawn his P320, but on cross-examination stated that she could not remember how long after the police she arrived, and noted that Guay's pain level was "extreme" at the time.[2]

What Guay testified is that on the cold evening of Tuesday, January 28, 2020, as he was unleashing his dogs after a walk around 6:00 p.m. in Hillsboro, he began to remove his holstered P320 from his belt.  He pushed down on his waist belt with his left hand, and then pulled the holstered P320 up with his right with the barrel pointed slightly to the rear of him.  He "wiggled" the holstered P320 to get it off his belt, and "then bang, the gun went off":

> A.    . . . So then I remove my coat, I release the dogs from the leashes at that point, and then therefore after I reach to - - I push down with my left hand on my appendix area, the belt, I keep the belt down, and then I pulled up on the P320.

---

[2]
> Q.    Have you read the officers' reports about this incident?
>
> A.    No, I have not.
>
> Q.    Are you aware that Mr. Guay, his testimony is that he stated that he was removing his holstered gun from his belt when it fired?
>
> A.    I was not sure of that. He was in a lot of pain, so he may have misspoken to me.

(Ex. 2, Newton dep., p. 27).

> And so that when [I] wiggled it slightly, so the barrel was facing backwards, and then bang, the gun went off.

. . .

Q.    No part of your hand is touching the pistol itself other than your thumb may be in contact with part of the slide?

A.    No, no, the thumb is on the holster, where the middle of the slide would be inside the holster.

Q.    Got it, got it.

(Ex. 3, Guay dep., pp. 88-93).

The bullet perforated his pants.  It entered his right thigh, tunneled through it, and exited his lower right thigh as shown here:



Officer William Bannister and Sergeant Nicholas Hodgen of the Hillsboro, New Hampshire

police department responded to the scene of the Guay shooting.  Officer Bannister was the first

to arrive.   He corroborated Guay's testimony that the P320 fired in its holster as he was

attempting to remove the holstered weapon from his belt:

> Q. Did you speak with Mr. Guay when you came in?
>
> A. I did, yes.
>
> Q. And what did he say, if you recall?
>
> A. He told me that he was attempting - - he was standing by the door, and he was doing something he did every day, and he grabbed a hold of the holster on the outside, showed me what he was doing, grabbed a hold of his holster on his pants to take it out of the pants, and that is when he said the firearm went off.
>
> . . .
>
> Q. . . . did you undertake any steps to determine whether the pistol was fully seated in the holster at the time it discharged or whether it was partially withdrawn from the holster based on the damage to the holster?
>
> A. So the pieces we gathered, this might be a little involved, the pieces we gathered, it appeared as though where it broke was that the pistol was fully seated, based on like where the hole was in his pants just underneath the holster.  You guys have the pictures, right?
>
> Q. Yes.
>
> A. Based on where we saw that and how the holster broke apart, that is why we believe the firearm was fully seated in that holster.

(Ex. 4, Bannister dep., pp. 18-19, 27-28).

Sergeant Hodgen was the next to arrive.  He also testified that Guay stated that his P320

fired when he was removing his holstered weapon from his belt:

> Q. I can put it up on the screen, if you need me to.
>
> A. So yes, there was a moment in which I did speak with Officer Bannister, Jacquelyn and Kyle [Guay].  This is going to be after I spoke to Jacquelyn alone, and then

during that conversation, Kyle had stated that he had been pulling his holster off his belt after arriving from work when the round went off.

And he testified that the holster damage was consistent with his opinion that it fired inside

the holster:

Q.    Is it damaged?  I am looking at the photograph down here on the lower - -

A.    As you are looking at that picture, what is going to be the lower right-hand side, there are pieces of the plastic of the frame of that holster that are all blown out of that lower right-hand side.

Q.    And was that consistent with your opinion that the gun was in the holster when it fired?

      Mr. Gibson:  Objection to form.

A.    Yes.



(Ex. 5, Hodgen dep., pp. 23-24, 37-38).

Guay's girlfriend, Jacquelynn O'Leary, was the first person to arrive at the scene.  She also testified that Guay stated his P320 had fired in its holster:

Q.      Did you ask him what happened?

A.      I did ask him what happened.

Q.      And what did he say?

A.      He said that he had taken the dogs for a walk.  He was coming back like he normally does.  After he hangs the leashes up, he goes to take his holster off, and he went to go remove the holster, the gun shot.

. . .

Q.      Did he say he pulled the gun out, or he didn't say anything about the gun?

A.      He only pulled the holster off.

Q.      Did he say anything - - I am sorry.  I didn't hear.

A.      The gun never left the holster.

(Ex. 6, Jacquelynn O'Leary dep., p. 17).

The content of the contemporaneous Hillsboro Police Department official report on the incident is also omitted by Sig in its Statement of Undisputed Facts.  The narrative of Sergeant Hodgen states:

At this point medical personnel were beginning to arrive.  As the medical personnel were arriving, I photographed the firearm, the spent round, some of the living room and kitchen area and continued to speak with Officer Bannister, JACQUELYNN and KYLE.  I learned that KYLE has been pulling his holster off his belt after arriving home when the round went off . . . At this time this does appear to be an accidental discharge while the firearm was in KYLE's holster.

(Ex. 7, January 28, 2020 Hillsboro Police Department report (Hodgen narrative), pp. 1, 3).

The narrative of Officer Bannister states:

8

I asked KYLE what had happened.  He stated that he was attempting to take his firearm off his right hip in the holster, when the firearm went off.  He stated that he did not touch the trigger assembly on the firearm because it was still fully in the holster, and had wrapped his hand around the holster to remove it from his pants . . . It is my belief that the firearm did go off accidentally, and inside the holster as stated by KYLE.  There is no reason or evidence to suggest KYLE negligently, purposely discharged the firearm in to his own leg. This ended our involvement in the case.

(Ex. 8, January 28, 2020 Hillsboro Police Department report (Bannister narrative), pp. 1-2).

Despite this substantial evidence supporting Guay's claim that his holstered P320 shot him that night, Sig gratuitously opines that that Guay "shot himself," and then moves on to its critique of Guay's experts.

## III.   Governing Summary Judgment, Causation and *Daubert* Law

### A.   *The Summary Judgment and Causation Standards*

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling upon a party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990).

The concept of proximate cause includes both the cause-in-fact and the legal cause for the injury. *Bronson v. Hitchcock Clinic,* 140 N.H. 798, 801, 677 A.2d 665 (1996) ]. Conduct is cause-in-fact if the injury ... would not have occurred without that conduct. *Id.* The evidence to support this causal link must be "sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." *Id.; see also Goudreault v. Kleeman,* 158

N.H. 236, 246, 965 A.2d 1040 (2009); RSA 507–E:2, I(c). This standard is satisfied if the evidence shows "**with reasonable probability, not mathematical certainty**, that but for the defendant's negligence, the harm would not have occurred." *Bronson,* 140 N.H. at 802–03, 677 A.2d 665. (emphasis added) "[L]egal cause requires a plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm." *Estate of Joshua T. v. State,*150 N.H. 405, 408, 840 A.2d 768 (2003). "Although the negligent conduct need not be the sole cause of the injury, to establish proximate cause a plaintiff must prove that the defendant's conduct caused or contributed to cause the harm." *Id.*

**B.**   ***Milward***

As noted, Sig omits from its *Daubert* briefs one of the now leading cases on the admission of expert testimony in the First Circuit, *Milward v. Acuity Special Products, Group, Inc.*, 639 F.3d 11 (1ˢᵗ Cir. 2009) (vacating district court decision excluding testimony of toxicology expert).  *Milward* rejects the draconian standards Sig would have the Court apply to the reports of Hicks and Villani.  And it was not considered by the district court in South Carolina.

In *Milward*, the plaintiff alleged that he developed acute promyelocytic leukemia (APL) caused by his exposure to benzene in products manufactured by defendants. Defendants sought to exclude the "general causation" testimony by plaintiffs' expert, Dr. Martyn Smith of the University of California holding that benzene exposure is *capable* of causing APL, a sub-variant of acute myelogenous leukemia.

The trial court, finding that the causation testimony of Smith was inadequate, granted defendants' motion to exclude Smith's testimony and entered judgment for the defendants. Plaintiffs appealed.

10

The First Circuit reversed the trial court's exclusion of Smith's testimony. It expressly recognized that there is a strict line between (i) the role of judge as gatekeeper of reliable testimony, and (ii) the jury's role as finder of fact on scientific issues. It said that courts may not exclude experts whose testimony falls within the range of matters about which reasonable experts can disagree. In their gatekeeping role courts may not decide which of competing scientific views is correct. The First Circuit held that the trial court "took sides on questions that are currently the focus of extensive scientific research and debate—and on which reasonable scientists can clearly disagree. In this, the court overstepped the authorized bounds of its role as gatekeeper."  639 F.3d at 22.

Finally, the *Milward* court rejected an "atomistic" study-by-study assessment of the scientific basis of expert testimony. "The district court erred in reasoning that because no one line of evidence supported a reliable inference of causation, an inference of causation based on the totality of the evidence was unreliable." *Id*. at 22-23.  That another explanation "may be right is not a sufficient basis for excluding" an expert's testimony.  Lack of certainty "is not, for the qualified expert, the same thing as guesswork." *Id*. at 22.

**C.**   **Daubert does not nullify the jury's role as fact finder**

Under Rule 702 of the Federal Rules of Evidence, an expert witness' testimony must, among other things, be "based on sufficient facts or data," and must be "the product of reliable principles and methods." Fed. R. Evid. 702(a)-(d). In fulfilling its gatekeeping function, a district court "must conduct a preliminary assessment" to determine whether the methodology underlying the expert witness' testimony is valid. *Id.* (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786). District courts have "considerable leeway" in determining the manner in which they evaluate an expert witness' reliability. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

As noted, an expert witness can testify based on his own specialized experience. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  Ultimately, it is the reliability of the expert witness's opinion that the court evaluates in its role as gate keeper, not its credibility. *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 105 (1st Cir. 2020).

Further, an expert may form his or her opinion based on experience or knowledge "gathered working in the [relevant] industry," which prevents complete preclusion of each party's expert.  *Paolo v. Vitex Extrusion, LLC*, No. 1:18-CV-01019-JL, 2020 WL 8184323, at *1 (D.N.H. Dec. 18, 2020), *citing Masello v. Stanley Works, Inc.,* No. 08-CV-136-JL, 2011 WL 1402058, at *4 (D.N.H. Apr. 13, 2011).

Finally, since Sig is heavily relying on one South Carolina district court case, it seems appropriate to cite a Fourth Circuit opinion that endorses Hick's and Villani's methodology and would allow their testimony:  **"[e]xamination and/or testing of an exemplar of the same product, in combination with a review of photographs of the allegedly defective product and/or testimony regarding the circumstances and nature of the allegedly defective product's failure, may, in some cases, constitute an entirely adequate and reliable methodology** for an expert to employ, especially where examination or testing of the allegedly defective product itself is impossible, impracticable, or would implicate issues of spoliation". *Peters-Martin v. Navistar Int'l Transp. Corp.,* 410 F. App'x 612, 620 (4th Cir. 2011) (emphasis

added).

### III.   **Discussion**

### A.   *Overview*

Contrary to what SIG suggests, a rational jury could find based on the evidence is that Guay's P320, like so many others, fired without a trigger pull when he was wiggling and jostling his holstered P320 to remove it from his belt. This is his unambiguous testimony that is corroborated by the police report and police officers.  A fully seated discharge means that the trigger could not have been pulled by Guay's finger because the trigger is covered by the holster. That SIG's experts disagree with Hicks' and Villani's conclusions simply means that they have a different opinion; it does not mean that a jury should not be allowed to hear and weigh Guay's experts' testimony.

Hicks' and Villani's opinion that Guay's P320 had manufacturing defects that could have allowed it to fire without a trigger pull under certain conditions, is at least relevant to the issues in the case.  Guay's claim is that his P320 shot him without a trigger pull according to:  (i) his own testimony, (ii) the weapon's history and pattern of inertial discharges, (iii) SIG's own statement that vibration can make the P320 fire, (iv) the police officers' testimony and reports, and (v) his experts' analysis and reports.  Moreover, Sig's claim that the holster damage suggests a partially unholstered discharge is squarely contradicted by one of its *own* prior expert reports in another P320 case, *Vadnais v. Sig*.  In that case, Sig's expert held that damage only to the top portion of the holster established a discharge out of the holster, which Guay's holster does not exhibit.  (Ex. 9, Knox report, pp. 52, section 16.2).

Unlike the SEPTA holstered discharge and numerous other P320 incidents around the country, no videotape of what happened that January day exists.  Regardless, SIG's attempt to

characterize Guay's weapon as perfectly fine is contradicted not just by his experts' opinions, but its own "urgent" universal replacement of the entire striker and firing assembly for all P320s purchased by the Department of Defense, approximately 2.5 years before Guay was shot, in May 2017.  (Ex. 10).  By itself this fact establishes SIG's knowledge of problems with the P320, including its sear, striker and trigger assembly, long before Guay was shot.

A jury should be allowed to weigh this evidence.

**B.**      ***The opinions of Timothy M. Hicks are based on sufficient data and reliable principles.***

Hicks possesses substantial experience with firearms and is a mechanical engineer as stated in his report and in his three Sig depositions to date in *Jinn v. Sig Sauer, Inc*., *Mayes v. Sig Sauer, Inc.,* and *Guay v. Sig Sauer, Inc.*  Contrary to what Sig claims, his report establishes that he has significant experience with firearms investigations, functions and testing.  It states:

> **Timothy M. Hicks, P.E.** is a Principal Engineer and has a diverse background in mechanical design and system evaluations, including accident reconstruction.  He spent close to 20 years in various roles in the automotive industry, responsible for the design, manufacturing, testing, and validation of vehicle systems.  He also has experience in leadership roles for commercial vehicle suppliers and manufacturers, including leading advanced engineering teams.  This experience includes conformance to governmental regulations, equipment safety, maintenance and service requirements, and field performance investigations.  As part of his consulting experience, **he has performed numerous investigations and certification tests on firearms and firearm safety devices, pursuant to California and Massachusetts state regulations, and for incidents involving firearms.  For the investigation described in this report, his investigation methods are in accordance with the generally accepted standards and practices of his field, including utilizing the scientific method.**
>
> Mr. Hicks is a Professional Engineer licensed by examination in the State of Illinois, and by comity in other states.  He is an active member of the Society of Automotive Engineers (SAE) and has been elected as Chair of the Chicago Section in 2018.  The Chicago Section numbers over 1,000 members.  He is also a member of the American Society of Mechanical Engineers (ASME), and the National Society of Professional Engineers (NSPE).  **He also holds Certificate of Eligibility from the California DOJ Bureau of Firearms and Massachusetts Firearms Records Bureau Executive Office**

**of Public Safety for analyzing and performing firearm certification testing.  (Ex. 11, p. 1).**

He also has substantial experience with testing and inspection of firearms:

Q.      All right.  So prior to March 17, 2021, would it be fair to say that you have inspected and tested approximately rough estimate 50 firearms pursuant to California certifications?

A.      I think the short answer is yes, related to performing those duties.

(Ex. 12, Hicks dep., p. 64).

Hicks' expert report is attached as Exhibit 11.  It provides a careful, compelling and detailed failure analysis of the defects in Guay's P320.  Hicks was present at the imaging and inspection of Guay's P320 in March 2021 at great expense to Guay.  Many of those images are contained in his report with detailed explanations of the problems that were observed.

For example:

Mr. Guay's pistol exhibited several design and manufacturing defects or variables that led to the un-commanded (unintended) discharge of the firearm.  The following items were identified:

1. The sear and striker pin components are both produced using a Molded in Metal (MIM) process and do not have any secondary machining performed on the critical surfaces, including the interface between the two components.  MIM produced components are susceptible to manufacturing areas of uncontrolled variability.  For surfaces where tight tolerances are required, MIM parts will typically have secondary processing, or machining, to eliminate the variation.



Figure 2 - Striker assembly with striker foot circled



Figure 3 - Top view of sear (circled)

2.  The sear and striker foot portion of the striker pin both exhibited inconsistencies on the surfaces that are in contact with each other, minimizing the actual contact surface area that is needed to keep the parts engaged until the trigger is pulled.  In addition to the as-cast surface (rough and unmachined) both parts also exhibited a raised area around the periphery of the interface surface.  This has been referred to by others as rollover and appears to be a combination of flashing, radiused corners, and shrinkage of the inner surface area.



Figure 4 - Close ups of sear step (left), and striker foot (right)

In comparison, the photo below is from a S&W M&P M2.0 pistol, showing the machined (or some other secondary processing after molding) surface of the striker foot.

16



**Figure 5 - S&W M&P M2.0 Subcompact striker foot**

3. In addition to the lack of secondary processing, there is also a vertical misalignment of the two parts, as shown in the CT scan.  The striker foot is unable to fully engage with the sear, reducing the area available for the engagement of the two parts.  It also appears that there is an angle difference between the two mating surfaces, reducing the contact area even more. Figure 6 from the CT scan also shows the sear unable to rotate upwards any further since it comes into contact with a pin.  With the minor amount of overlap between the two components, only a minor amount of trigger movement would allow the striker to move forward and discharge a round.





0.59 mm
(0.023″)

Figure 6 - CT scan slice of striker foot to sear misalignment (top) and zoomed in measurement (bottom)

4.     As shown in the CT scan below, there is also a lateral offset between the sear and the striker foot, with a visible edge to the sear step.



Figure 7 - CT scan view of offset striker foot to sear (circled)

5.  In looking at the rear-view slice of the striker pin relative to the housing channel, there is a large lateral gap on both sides of the striker foot.  This allows for axial rotation of the striker pin and foot each time the firearm is discharged and the slide activates.  This rotation will also cause the safety lock tab that makes contact with the parallel horizontal plain of the striker to be out of alignment.  Any misalignment could cause minimal contact between the safety lock tab and the rear vertical portion of the striker, thereby reducing the contact area between the two surfaces.  This misalignment could potentially allow the striker pin to continue its forward movement when the striker foot is no longer retained by the sear.

Based on these short excerpts from his report alone, it is inaccurate and misleading for Sig to claim that Hicks "made no attempt to determine how the discharge occurred."  His report shows exactly such an attempt, and he reached conclusions about how it did happen after analyzing a substantial amount of data regarding Guay's P320.  It would be more accurate for Sig to state simply that it does not agree with his conclusions, rather than that he made "no attempt" to determine how the discharge happened.

Sig's claim that Hicks has never "analyzed the design of the internal components he claims are defective as compared with any other pistol model's components" (Def. Mem., p. 3) is also incorrect.  Hicks' report in Guay and other P320 cases establish that he performed precisely that analysis:

Q.      So for the sear and the striker pin, how the use of MIM affect the performance of those parts?

A.      Well, I talk about in my item 1.  Because the MIM parts are used as molded, the inconsistency between the designed-in interface between the two parts is compromised.

Q.      And what effect does that have on the pistol and the performance?

A.      That overlap which I have measured in the CT scan is on the order of between - - it depends on whose measurement you use, 30 thousandths and 40 thousandths of an inch, which is in the range of eight pieces of paper thick.  So it's that overlap that is holding back the striker force once the weapon is charged.  So any motion, any compromise between those surfaces, including, you know, inertia, once it's in a holster being worn, can get the striker to slip off the edge of the sear.

(Ex. 12, Hicks dep., pp. 114-115).  Guay submits the entirety of his report to the Court for its objective review rather than recite its entire content here.  Hicks's conclusions are reached to a reasonable degree of scientific and engineering certainty, contrary to what Sig claims.  (Ex. 11, p. 11).  He is not merely guessing or speculating.

Sig declares that "nothing" in Hicks' "work experience or education" qualifies him to provide any opinions about firearm design or manufacture.  (Mem. Law, p. 1).  This is inaccurate as shown above.  It is also misdirection in that Hicks' testimony and report are limited to how this specific product, the Sig P320, has failed due to manufacturing defects. Its complaint that Hicks has never personally "witnessed a P320 fire without a trigger pull" is absurd.  (Def. Mem. Law, p. 4).  It would be unsafe to an extreme degree to require Hicks or anyone else to "witness" a P320 defectively firing on its own before being worthy to testify about how the weapon can fail.  No case law requires an expert to risk his or her life to replicate an event that has already been replicated in real life many times over the last six years.  Common sense would prohibit it.  What Hicks testified is that he has seen videotape

evidence of the P320 firing on its own and that it corroborated his existing opinions:

> Q.    Then we go to replication. What did you do to replicate -- well, let me start with this:  Would you agree with me that you have not, because you testified to this earlier and I'm starting to repeat it, would you agree with me that you have not replicated a P320 discharge without a trigger pull?

> A.    [Not] Personally myself, but I think when you've asked me this before, I talk about the other similar incidents with equally qualified and experienced firearm law enforcement officers.

> Q.    Okay. So when -- so you -- you have not, just you, you have not replicated a P320 discharge without a trigger pull; correct?

> A.    For the various reasons we've talked about earlier, yes.

> Q.    So on the replication portion of this on which you rely for your conclusion, that it was more likely than not that Special Agent Jinn's pistol discharged without a trigger pull, are you relying on instances of other discharges?

> A.    Yes.

> Q.    Which ones?

> A.    I think Mr. Bagnell outlines all those in his complaint. And then the materials that are identified as pertinent in my materials reviewed, the most significant one is the SEPTA police officer video.

> Q.    Okay.

> A.    I know there were others. We looked at an image on the Guay matter of a St. Claire, Michigan, officer in the -- outside the wall of the jail. I think it was in the -- the sally port area where he was attempting to remove his holster similar to the other cases that we've talked about where it discharged without his finger anywhere near the trigger.

> . . .

> A.    I don't know how that would even be accomplished.

> Q.    Right.

> A.    On top of being very dangerous.

21

Q.      Right.  So it's not something - - I just want to confirm that that is an
        animation but no something that you've seen on a subject pistol because you
        have not seen the internal components while it's firing to do that, correct?

A.      Or in a holster, correct.  Yes.

Q.      Have you ever personally witnessed a P320 fire without a trigger pull?

A.      Not personally beyond the videos of some of the events, including SEPTA,
        where that was captured on video.  I have personally not been present when
        one had an un-commanded discharge.

(Ex. 12, Hicks dep., pp. 101, 102, 168-169).

At least seven un-commanded discharges of the P320 have been captured on video

consistent with Hicks' testimony.  Hyperlinks to videos of four of these incidents:  Roscommon

Michigan (February 2016); Philadelphia's Suburban Station (August 2019); a Milwaukee Police

Department parking lot (January 2021); and Saint Clare Prison in Detroit, Michigan (August

2021) are here:

1.      *Roscommon, Michigan February 2016*.  From 6:00 minute mark on:

https://vimeo.com/geomatrixproductions/review/327346849/4f8af65fc0

(password:  richardson320).

SIG claims that the officer's "seat belt buckle" somehow dove into the officer's holster

and pulled the trigger in this case.  However, the video clearly shows in several frames that the

seatbelt is in place and fully retracted.  In addition, a reflection of the officer standing stunned

outside his patrol car shows his holstered P320 has nothing attached to it.  The officer himself

states in the video that the seatbelt did not make his gun fire and notes that the casing did not

eject.

2.      *Southeastern Pennsylvania Transportation Authority (SEPTA) officer Suburban

Station, Philadelphia August 2019*.  The incident has occurred as soon as video begins.  At 2:20

to 2:40 mark the officer expressly states that the gun is still holstered.

https://www.dropbox.com/s/rp5kmsth6xp0zcb/SEPTA000083.AVI?dl=0

3.    *Undercover Milwaukee officer in police department parking lot, Milwaukee, Wisconsin January 2021*. Discharge is around 1:20 mark.  Note that the officer's hands are full.  The gun launches out of the holster as he exits the car.  The gun hits the side of his car and goes up in the air and then falls to the ground.

https://www.dropbox.com/s/xdrs8gzkwgy222k/clip0001.avi?dl=0

4.    *Saint Clare Prison, Detroit, Michigan August 2021*.  The discharge occurs early in the video. The still frame Hicks references is attached as Exhibit 13.

https://www.dropbox.com/s/qv4iszuuyety5dl/2021septclip0243.avi?dl=0

Sig itself has never produced a single videotape or records of any vibrational testing it, or any contractor, performed on the P320 to determine if it can fire without a trigger pull, or allegedly cannot, since the P320 was put into commerce in 2014.  Not one video in six years has ever been produced, nor any testing data.  It is simply not credible to suggest that a major manufacturer like Sig has no testing data on one of its inherently dangerous products.

What the record evidence shows is that Sig stated on August 4, 2017 that "vibration" can make it fire and numerous people have claimed, including Guay in this case, that jostling a holstered P320 (a clear form of vibration) was enough to make it discharge and shoot them.  The 2017 press release itself is an admission and admissible evidence under Fed. R. Ev. 801(d)(2)(A) ((2) *An Opposing Party's Statement*. The statement is offered against an opposing party and:  (A) was made by the party in an individual or representative capacity").  This is direct evidence of negligence.

23

Sig's additional criticisms that Hicks allegedly failed to rely on any "published studies or material" in conducting his analysis is unjustified.  (Def. Mem. Law, p. 13). There are none to Guay's knowledge and Sig cites none.  There is no treatise on how striker-fired weapons fail.  The ability of a striker-fired pistol to fire without a trigger pull is a relatively new phenomenon in the history of firearms and the design itself, on a commercial level, is relatively new also.[3]  In any case, the review of any published materials is not a *sine qua non* of an expert being permitted to testify under *Daubert*.  *See Milward*, *supra*, ("[t]he district court erred in reasoning that because no one line of evidence supported a reliable inference of causation, an inference of causation *based on the totality of the evidence* was unreliable").  *Id*. at 22-23 (emphasis added) (Ex. 1).

**C.**   ***The opinions of Peter Villani are based on sufficient data and reliable principles.***

Sig relies primarily on the South Carolina opinion in *Frankenberry v. Sig* to support its argument that Villani should be disqualified.  This case should be distinguished as the court erred in stating:

> However, Villani's methodology of inspection "was limited to the disassembly of the Pistol - - which was performed by Defendant's expert, and Villani's visual examination of internal components along with a review of unclear X-rays, and CT-scan images of the pistol.  Villani also took measurements of the internal components of the Pistol and compared them to the measurements of components from exemplar pistols.  Moreover, as to Villani's "rollover" theory, he has not confirmed that this condition could cause components that are engaged - - specifically the striker foot and sear - - to lose that engagement without a trigger pull.

(Ex. 13, p. 11).

---

[3]    "Hammer-fired handguns have withstood the test of time and are still manufactured to this day for those that wish to have a pistol that can be double or single action. Striker-fired handguns, however, are more modern and have seen a huge increase in commercial adoption in the last few decades due to some big brands like Glock, FN-America, Sig Sauer, and Smith & Wesson."  https://www.triangleshootingacademy.com/ccms/index.cfm/news-articles/resource-center/hammer-fired-vs-striker-fired/

Villani's methodology was not limited to "disassembly of the pistol."  He makes this

very clear in all his expert reports in the case.  (Ex. 13).  Pursuant to the parties' joint

inspection protocol, Sig's expert conducted the disassembly.  Villani supervised it.  The four

guns in March 2021, one of which was the Guay gun, were then placed in CT-scan

machines.  There were no additional "X-ray" images nor were the CT scan images unclear.

They were state of the art CT scan images.  The South Carolina court omits that Watkins

then took microscopic photos of the surfaces of internal P320 parts that all showed

substantial surface irregularities to all present which made him gasp and stop work.

The South Carolina court correctly states that Villani "took measurements of the

internal components of the Pistol and compared them to measurement of components from

exemplar pistols."  That is precisely what the Fourth Circuit held was a proper methodology

in *Peters-Martin*:

> "*Examination and/or testing of an exemplar of the same product, in combination with a
> review of photographs of the allegedly defective product and/or testimony regarding the
> circumstances and nature of the allegedly defective product's failure, may, in some
> cases, constitute an entirely adequate and reliable methodology* for an expert to employ,
> especially where examination or testing of the allegedly defective product itself is
> impossible, **impracticable**, or **would implicate issues of spoliation**".

*Peters-Martin,* 410 F. App'x 612, 620 (4th Cir. 2011) (emphasis added).

There, the *Peters-Martin* court describes *exactly* what Villani and Hicks did with the

Guay gun and other P320s.  It should take precedence over one district court case that does

not accurately recount the inspection methodology employed by Guay's experts.  As noted

*supra*, the Eastern District of Virginia in *Vadnais v. Sig Sauer* found almost identical

arguments by Sig that her experts should be disqualified because their P320 methodologies

were "unreliable" to be invalid and were dismissed them from the bench.

Finally, the South Carolina court's claim that Villani could not "confirm" that his rollover theory could cause the spring-charged striker foot and sear face connection to fail is incorrect. While like Hicks he did not conduct any experiments shaking a loaded P320, putting his life at risk, Villani testified that the failure has been replicated in real life many times.

Villani states in his report that "[a]fter a careful review of the discovered design and manufacturing defects within all of the Sig Sauer model P-320 pistols that I have personally examined, I can, to a reasonable degree of technical certainty state that the four subject pistols discharged without manipulation of the triggering mechanism." (Ex. 14, Villani report, section 21). Sig is free to cross-examine Villani with any deposition statements that are inconsistent with this statement. But it is inaccurate to claim that Villani has not stated it.

Moreover, his opinion, after extensive testing of exemplars, is that the sear could not have been fully engaged with the striker on Guay's P320 - - because of the clear evidence showing that his weapon fired in the holster. Sig ignores this testimony entirely:

Q.      And what's your basis for saying the gun was in the holster when it discharged?

A.      Because it blew the holster to pieces.

(Ex. 15, Villani dep., p. 35).

He also testified that the sear and striker face on the defective version of the P320 bare significant surface irregularities that compromise surface contact and make it subject to release based on inertial movement of the weapon. As is known, SIG "urgently" replaced this sear along with the entire striker and firing assembly on the military version of the P320 in May 2017 (if not sooner) because it knew it was at least problematic. (Ex. 10). But it left the commercial

version used by Guay and law enforcement agents in its unmodified condition.

SIG, again, is free to cross-examine both experts at trial.  But to claim that their methods were somehow junk science, unreliable, or guesswork is not credible.

## IV.  <u>Conclusion</u>

For the reasons stated, defendant's Motion for Summary Judgment should be denied.

PLAINTIFF
KYLE GUAY

By:

   /s/
Jeffrey S. Bagnell
Federal Bar No. CT18983
Admitted Pro Hac Vice
Jeffrey S. Bagnell, Esq., LLC
55 Post Road West, Suite 200
Westport, Connecticut 06880
(203) 984-8820
jeff@bagnell-law.com

Counsel for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 19th day of April 2022, undersigned counsel will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kristen E. Dennison, Esq.
Kristen.dennison@littletonpark.com

B. Keith Gibson, Esq.
Keith.gibson@littletonpark.com

Mark V. Franco, Esq.
Mfranco@dwmlaw.com

Counsel for defendant SIG Sauer, Inc.

By:        /s/_____
        Jeffrey S. Bagnell