UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kyle Guay

      v.

Sig Sauer, Inc.

Civil No. 20-cv-736-LM
Opinion No. 2022 DNH 109 P

**O R D E R**

On the evening of January 28, 2020, plaintiff Kyle Guay returned home from walking his dogs and, as he did every night, started to remove his holster from his belt. The holster held his Sig Sauer P320 pistol. While removing the holster—and even though he had not pulled the trigger—the P320 suddenly fired. Guay was shot in the leg and sustained entrance and exit gunshot wounds to his right thigh.

Guay sued Sig Sauer for products liability, violation of express and implied warranties, violation of the Magnuson-Moss Warranty Act, and violation of New Hampshire's Consumer Protection Act, RSA chapter 358-A (the "CPA"). In July 2022, the court held a four-day jury trial. The CPA claim was tried to the court because there is no right to a jury trial under that statute. See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 369-70 (2009). A jury decided the remaining claims in Sig Sauer's favor. After trial, the court took the CPA claim under advisement.

Despite finding Guay's version of events credible, the court concludes that Guay did not meet his burden to prove that Sig Sauer engaged in an unfair or

deceptive act under the CPA.  <u>See</u> RSA 358-A:2.  This order details the court's findings of fact and rulings of law.  <u>See</u> Fed. R. Civ. P. 52(a).

**FINDINGS OF FACT**

I. <u>Kyle Guay</u>

Guay lives in Hillsboro, New Hampshire, and works as a shop foreman servicing vehicles.  He has a long history of using firearms.  His father—a military veteran—first taught Guay to handle guns when Guay was between three and five years old.  In addition, Guay's brother—also a veteran—trained Guay in firearms use.  Guay took a hunter safety course in his early teens.  As to pistols specifically, he bought his first one in 2010.  Prior to this incident, none of Guay's guns had ever accidentally discharged.

Guay purchased a Sig Sauer P320 pistol at Shooters Outpost in Hooksett, New Hampshire, in December 2016.  Before buying it, Guay researched the P320 online.  During this research, Guay read a statement on Sig Sauer's website stating that "the P320 won't fire unless you want it to."  Specifically, the statement read:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

After purchasing the P320, Guay carried it with him every time he took his two dogs for a walk.  He had no incidents with it for three-plus years.

II.  The Accident (January 28, 2020)

On January 28, 2020, after returning home from taking his dogs for a walk, Guay began to remove his holster, using his right hand to grab the holster and work it off his belt.  The gun fired, and a bullet went through Guay's right thigh—leaving an entrance and exit wound.

Guay testified that he did not remove the gun from the holster.  Rather, he described the gun firing when he grabbed the holster to remove the holster from his belt.  Guay claimed that he had not pulled the trigger—even accidentally.  In shock and on the floor, Guay telephoned his longtime partner, Jacquelyn O'Leary, who called 911.

Two Hillsboro police officers—Officer William Bannister and Sergeant Nicholas Hodgen—arrived soon after, and Guay told them what happened.  Guay said that he did not touch the trigger on the P320, and the gun was still fully in the holster when it accidentally fired.  What Guay told the officers was consistent with his testimony at trial.  While in Guay's home, the officers saw that the holster had exploded into pieces; a larger fragment of it was still attached to Guay's pants, and other pieces were strewn about in the area.

An EMT arrived and helped get Guay into an ambulance.[1]  At the hospital, medical staff washed his wound with a saline solution, and then "packed it" with gauze.  Guay was discharged the next day.

After being released from the hospital, Guay was out of work for three weeks. His pain continued, and he would sometimes feel a vibrating, burning sensation in his leg.  He had trouble sleeping and would wake up in the middle of the night with night terrors.  He described the night terrors as seeing "demons coming out of my legs" and sometimes seeing "weird-monster"-like-flowers, growing out of his legs. He would wake up drenched in sweat.  To this day, he still takes sleeping medication to cope with his anxiety.

The court found Guay credible in every respect.  Specifically, the court credits Guay's testimony that the gun was still fully inside the holster when it discharged. With the gun fully in the holster, Guay could not have accessed the trigger; it would have been impossible for him to have accidentally pulled it.  Moreover, as expert testimony revealed, the P320 had a 6.7-pound trigger, meaning that to fire, the user had to exert 6.7 pounds of pressure.  The court does not believe that Guay could have applied that amount of force to the trigger inadvertently while the gun was in

---

[1] The EMT testified that Guay told her that he accidentally shot himself in the leg when he was attempting to take his gun out of his holster.  Sig Sauer made much of this inconsistency.  The court does not put much weight in the EMT's testimony on this point, because her focus at the time was on treating Guay's gunshot wounds, not on recording the precise manner in which Guay described the gun discharging.  Guay testified at trial, and told Officer Bannister shortly after the incident, that while he was attempting to take the holster off the belt on his pants, the gun was still fully in the holster.  Guay never deviated from that version of events.

the holster.  In short, the court found Guay's testimony about the gunshot, how it occurred, and his resulting injuries consistent and believable.  The court therefore places great weight on Guay's testimony.

### III.  Problems with the P320 Pistol (May 2017)

Sig Sauer began selling the P320 pistol in 2014.  Sean Toner is a senior design engineer at Sig Sauer and the leader of the P320's design team.  He testified as one of Sig Sauer's expert witnesses.  Sig Sauer designed the P320 principally to market to the military and law enforcement, which looks for simple, easy-to-use, and lightweight firearms.

In January 2017, Sig Sauer entered a contract with the United States Army (worth $580,000,000) to supply the Army with a new service pistol.  In May 2017, the Army issued a change proposal, in which it identified various problems with the P320 and requested that Sig Sauer make several changes.  Most notably, the Army had realized that when dropped at a certain angle, the P320 could accidentally fire. At trial, Toner explained that the trigger was essentially activating itself during the drop.  Because the components inside the gun have inertia, the trigger could continue falling after the gun hit the ground and, if the gun landed at a particular angle, this could effectively cause a trigger pull.  In response to the Army's concerns, Sig Sauer modified the P320's design by, among other things, reducing the weight of the internal components to have less inertial effect.

Sig Sauer also modified the commercial version of the P320, and as of August 2017, all commercial P320s manufactured by Sig Sauer were the modified version. On August 4, 2017, Sig Sauer issued a press release entitled "Sig Sauer® Reaffirms Safety of the P320® Pistol." It stated that there "have been zero (0) reported drop-related P320 incidents in the U.S. commercial market, with hundreds of thousands of guns delivered to date." The press release did not mention that there had been reports of drop-fires in the primary market for P320s (the military and law enforcement market).

A few days later, on August 8, Sig Sauer issued another press release announcing its "voluntary upgrade program." Per the program, a customer (like Guay) with a P320 manufactured before August of 2017 had the option to contact Sig Sauer, mail in their gun, and have Sig Sauer "upgrade" it free of charge and ship it back to them. The press release stated, however, that the pre-upgrade version of the P320 still met U.S. standards for safety, as well as rigorous testing protocols for global military and law enforcement agencies.

Guay reviewed information about the voluntary upgrade on Sig Sauer's website. He declined to send his gun in for repairs because Sig Sauer's website assured him that the P320 was still safe without the upgrade. Specifically, the website contained a Frequently Asked Questions section, where it stated: "Is my P320 safe in its current configuration? Yes. The P320 meets and exceeds all US safety standards . . . ." Pl.'s Exh. No. 25.

At trial, Guay made much of the fact that Sig Sauer labeled its program a "voluntary upgrade" rather than a "mandatory recall," arguing that the choice of language contributed to his belief that the P320 model he owned was safe.  Yet, though Sig Sauer conceded that the pre-upgrade P320 had a potential "drop-fire" problem, there was no evidence introduced at trial that (at the time of the upgrade program) Sig Sauer had any reason to issue a recall for the accidental misfire problem that Guay later experienced.  And, there was no evidence introduced at trial connecting the mechanical relationship between the "drop-fire" problem identified by the Army and the accidental misfire that Guay experienced.

As for Sig Sauer's decision to call its program a "voluntary upgrade," Toner testified that "there isn't much difference" between the terms "mandatory recall" and "voluntary upgrade."  He testified that the pre-upgrade P320 continued to satisfy industry standards—even though he conceded it was susceptible to the drop-fire vulnerability that the Army identified.  Toner testified that the modifications made as part of the upgrade program did not offer any additional protection against the P320 firing without a trigger pull because—in his opinion—it would be impossible for the P320 to fire without a trigger pull.

Not all Sig Sauer executives agree with Toner's interpretation of the language "voluntary upgrade" versus a "mandatory recall."  Phil Strader, a corporate designee for Sig Sauer, testified (during a deposition in a different P320 misfire case) that Sig Sauer could have labeled the initiative a "mandatory recall" instead of a "voluntary upgrade."  Indeed, he pointed out that Sig Sauer had

previously issued a mandatory recall for one of its rifle models.  He further testified

that a mandatory recall for the P320 would sound "worse" and "more dire" than a

voluntary upgrade.  In any event, the evidence at trial established that, with

respect to Guay, the language of the press releases (and the information on Sig

Sauer's website) persuaded Guay there were no safety concerns with his P320 and

he saw no reason to send it in for repair.

IV.  <u>Evidence of other accidental misfires</u>

Although the Amended Complaint in this case contained numerous

allegations of other P320s misfiring, the evidence at trial included only one other

misfire incident (in addition to Guay's).  Specifically, Guay introduced video footage

of an alleged misfire of a P320 in Roscommon, Michigan, that occurred on February

4, 2016.  The video was from the bodycam of Officer Michael Richardson of the

Roscommon Sheriff's Department.  The video begins with Officer Richardson sitting

in his cruiser on the side of a highway to help a car stranded in a snowstorm.  The

video shows Officer Richardson exiting his cruiser when suddenly his holstered

P320 fires.  After the sound of the gunshot, Officer Richardson speaks to another

officer at the scene as follows:

| RICHARDSON: | What the hell? You explain to me how a gun goes off getting out of the car. |
|---|---|
| OTHER OFFICER: | Huh. What? |
| RICHARDSON: | Yea. |
| OTHER OFFICER: | No shit. |
| RICHARDSON: | Holy shit. |

| | |
|---|---|
| OTHER OFFICER: | Scare the shit out of you huh? |
| RICHARDSON: | Something hit my leg. I don't know if I'm shot or what but … |
| OTHER OFFICER: | Looks like your ah hip. |
| RICHARDSON: | You're my witness man. I'm glad I got a witness. Look at that you tell me how that goes off? |
| OTHER OFFICER: | Holy shit. I don't know man. That's bizarre. You were just standing up and it went off. |
| RICHARDSON: | Yea, I was just getting out of the car. |
| OTHER OFFICER: | Good thing it didn't get your frick'n *(inaudible)*. |
| RICHARDSON: | Holy shit man. |
| OTHER OFFICER: | Or your hand. I'm not a big fan of Glocks. |
| RICHARDSON: | It's not a Glock it's a SIG. |
| OTHER OFFICER: | Oh, it is? |
| RICHARDSON: | I am going to take this out and unload the damn thing. It even wrapped another one in. Oh no, it didn't. That's a discharged round. |
| RICHARDSON: | Can I get your name? |
| OTHER OFFICER: | Yea. Get you my card. |
| RICHARDSON: | Whoa. That could have ruined my whole goddamned day. |
| OTHER OFFICER: | Explain that to the sheriff, eh? |
| RICHARDSON: | Yea.  I am so glad you're here man. |
| RICHARDSON: | Could you imagine having to explain that, hey, I was getting out of the car, and it went off. And they're going to be like, are you serious? Wow, that hurt. That stung. |
| . . . | |
| RICHARDSON: | I just for the life of me can't figure out how that went off. |

OTHER OFFICER:  Yea, because there's no, uh, your seatbelt wouldn't have hit that.

RICHARDSON:  No, I mean, the trigger was completely covered. I don't know. Honestly, I don't know. No idea. Like I said, I'm glad you were here, man, you're my witness.

. . . .

In his Incident Report (dated February 4, 2016), Officer Richardson wrote: "As I exited the patrol vehicle, my weapon discharged while being completely in the holster."

After the incident, a sergeant with the Roscommon County Sheriff's Department investigated.  Contrary to Officer Richardson's statement in the video that the seatbelt could not have hit the trigger because it was completely covered, the sergeant found that, as Officer Richardson rose to exit his car, the driver's side seatbelt somehow dislodged the trigger.  At trial, the Sheriff Department's findings were presented in the form of an affidavit.  The court was not persuaded that the seatbelt somehow caused the accidental discharge; the court found the video itself (including Officer Richardson's statements at the scene) persuasive evidence that the P320 can misfire without someone pulling the trigger.

Even though the Roscommon incident occurred in February 2016, there was no evidence that Sig Sauer became aware of the incident (or saw the video) close in time to the incident.  Rather, the only evidence introduced at trial that anyone at Sig Sauer had seen the Roscommon video was a deposition of a Sig Sauer corporate executive that took place on January 10, 2019.  That deposition established that

employees at Sig Sauer had watched the Roscommon bodycam video, and the company had, at one time, a copy of it in its possession.  But the evidence at trial did not establish the date on which Sig Sauer first became aware of the incident.

Other than Guay's testimony and the video of the Roscommon incident, Guay introduced no other evidence about specific P320s and alleged misfires.  There was mention—in passing and without any detail— that Guay's two expert witnesses (Peter Villani and Timothy Hicks) had examined other P320s and had discovered the same problem they detected in Guay's gun: that the P320 was capable of accidentally discharging without a trigger pull.  Both of those witnesses had examined other P320s where the owner had alleged a similar accidental misfire.  Specifically, Villani testified that he had examined 12 other P320s in connection with accidental misfires, or "uncommanded discharges."  Hicks testified that he had investigated and analyzed 8-10 other P320s alleged to have discharged without a trigger pull.  However, Guay introduced no further evidence about the other P320s that Villani and Hicks had examined.

On cross-examination of Sig Sauer's expert witnesses (Sean Toner and Derek Watkins), Guay asked about their knowledge of other misfire incidents.  This line of questioning focused more on the experts' attitudes toward the allegations than on details about the allegations or the guns at issue.  For example, Toner testified that, including Guay's P320, he had examined at least four P320s (not including the Roscommon P320) that were alleged to have discharged without a trigger pull.  He found no problems or defects in Guay's gun, nor in any of the other guns he

examined.  Toner testified that it was not possible for Guay's gun or any other P320 to accidentally misfire.  Despite Sig Sauer having the Roscommon video in its possession since at least January 2019, Toner testified that he first learned of the Roscommon incident the month before this trial.  When asked if it concerned him that multiple people were claiming that their guns were going off without a trigger pull, Toner stated: "It did give me concern but it didn't make me investigate — want to investigate whether it would be possible or not."

On cross-examination of Derek Watkins, Guay also inquired about Watkins's awareness of allegations of accidental misfires.  Watkins is a mechanical engineer who runs a Kentucky consulting company that offers expert services in products liability actions, specifically in the firearms industry.  Watkins examined Guay's P320 and concluded that there was no problem with Guay's P320 and the only way it could have fired was if Guay had somehow pulled the trigger.  Watkins testified on cross-examination that Sig Sauer had retained him in approximately 13 other cases where P320s were alleged to have fired without someone pulling the trigger. He reached the same conclusion in every instance: there was no defect in any P320 that could cause it to accidentally misfire.  Watkins testified that, during the process of writing his report, he read Guay's complaint.  He acknowledged that the complaint contained numerous other alleged incidents of the P320 firing without someone pulling the trigger.  Watkins conceded that he did not mention any of those allegations in his report.

That line of cross-examination ended as follows:

Q. I'm asking because nowhere in your report is there any discussion of all the other incidents around the country involving allegations that the P320 discharged without a trigger pull on law enforcement [and] civilians from California, Texas, Connecticut, 20 other states.  It's not in your report, correct?

A. No, that's not in my report, no.

In sum, the evidence at trial included two incidents of an alleged misfire without a trigger pull: Guay's testimony (his accident on January 28, 2020) and the video of the Roscommon incident (occurred on February 4, 2016).  And, each of the four experts mentioned that they were aware of other, unspecified, and undated allegations of P320s misfiring without a trigger pull.[2]

## RULINGS OF LAW

Count VII of Guay's Amended Complaint alleges that Sig Sauer violated the CPA.  "Whether a party has committed an unfair or deceptive act, within the meaning of the [CPA], is a question of fact." CRMC Bethlehem, LLC v. N. Country Env'tl Servs., Inc., No. 1:09-cv-344-JL, 2010 WL 3002025, at *3 (D.N.H. July 29,

---

[2] To the extent that Watkins and Toner testified that it is impossible for a P320 (or for Guay's P320) to have fired without a trigger pull, the court finds their opinions unpersuasive.  As discussed, the court found credible Guay's testimony that he did not pull the trigger, and the video of the Roscommon incident was persuasive in showing that a P320 can fire without a trigger pull.  Furthermore, Watkins admitted that—despite having read the numerous allegations of misfires (without a trigger pull) in the complaint—he did not deem them worthy of mention in his expert report. And Toner testified that he found such misfire allegations unworthy of investigation.  Had Watkins and Toner been less dismissive of these allegations, the court may have found their testimony more credible.

2010) (emphasis omitted) (quoting Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993)).  The New Hampshire Supreme Court has noted that under the plain language of the CPA, "the court is vested with the authority to decide claims brought under RSA chapter 358-A."  Hair Excitement, 158 N.H. at 369.   The plaintiff has the burden of proving his CPA claim by a preponderance of the evidence.  See Moulton v. Bane, No. 14-cv-265-JD, 2016 WL 1091093, at *11 (D.N.H. Mar. 21, 2016).

The CPA provides that it is unlawful "to use any unfair method of competition or . . . unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  RSA 358-A:2.  The statute sets forth a non-exhaustive list of seventeen unfair methods of competition and deceptive acts or practices.  See id. at I-XVII.  Guay alleged in the Amended Complaint that Sig Sauer violated sections V and VII.  Section V states that it is unlawful to "[r]epresent[] that goods or services have . . . characteristics, . . . benefits . . . that they do not have . . . ."  RSA 358-A:2(V).  Section VII states that it is unlawful to "[r]epresent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another . . . ."  RSA 358-A:2(VII). [3]  To prove a claim under these

---

[3]In his Proposed Findings of Fact and Rulings of Law (doc. no. 83), Guay argues that Sig Sauer committed an unfair or deceptive act based on the Federal Trade Commission ("FTC") standard, which the New Hampshire Supreme Court has endorsed.  See Milford Lumber Co., Inc. v. RCB Realty, Inc., 147 N.H. 15, 19 (2001).  Guay is correct that the New Hampshire Supreme Court looks to the FTC to interpret RSA 358-A.  Id.  Although Guay cited the FTC standard in his recent filing, he has not made any argument about that standard nor has he advanced any alternative theory of liability.  And, in the Kelton and Beer cases, discussed infra,

sections of the statute, a plaintiff must establish that the defendant "made a representation, with actual knowledge of its falsity or reckless disregard for its truth, with the intent to induce consumers to enter a transaction." D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 561 F. Supp. 3d 114, 122 (D.N.H. 2021) (analyzing a claim under section V); Brace v. Rite Aid Corp., No. 10–cv–290–LM, 2011 WL 635299, at *3 (Feb. 14, 2011) (same test under section VII); McNeal v. Lebel, 157 N.H. 458, 469 (2008)) (holding that CPA not violated where the alleged misrepresentations were not made to induce plaintiffs to enter a consumer transaction).

Guay's theory of liability at trial was that Sig Sauer violated the CPA when it advertised that the P320 was safe and that it "won't fire unless you want it to." The evidence established that Guay saw that advertisement in December 2016, and that it induced him to purchase the gun. Thus, liability under Guay's theory could obtain under either section V or section VII. See Beer v. Bennett, 160 N.H. 166, 169 (2010) (holding that seller could violate either section V or VII for representing an item has characteristics or qualities it lacks); Kelton v. Hollis Ranch, LLC, 155 N.H. 666, 667 (2007) (same).

Because the statutory language requires "unfair or deceptive" conduct, the New Hampshire Supreme Court has held that the seventeen unfair methods

the New Hampshire Supreme Court has explained the requisite degree of knowledge a consumer like Guay must prove for a seller like Sig Sauer to be liable under the CPA for engaging in an "unfair or deceptive" practice. These rulings are controlling on the critical question in this case.

15

defined by statute do not impose strict liability and require "some element of knowledge on the part of the defendant." Kelton, 155 N.H. at 668.  Two cases illustrate the requisite degree of knowledge.

First, in Kelton, a seller advertised a horse as a gelding (i.e., a castrated male horse), but the horse later turned out to have an undescended right testicle that produced testosterone, causing stud-like behavior.  Id. at 666.  The buyer argued that the horse seller violated sections V and VII because he represented that the horse had characteristics it did not have.  See RSA 358-A:2, V & VII.  The court disagreed, holding that 358-A does not impose strict liability because the plain language of the statute requires that a defendant's conduct be "unfair" or "deceptive."  155 N.H. at 668.  The court noted that a veterinarian had examined the horse and determined that an examination—even by a veterinarian—prior to the sale would not have indicated that it had a recessed testicle, and that there was no reason for the seller to have known about it.  Id.  Because the seller had no knowledge, the court found that its conduct was not "deceptive" or "unfair" under the CPA.  Id. at 668.

In Beer v. Bennett, the court distinguished Kelton and found the seller had the requisite knowledge for liability.  160 N.H. at 168.  In Beer, an automobile dealer advertised a vintage car as having "pretty vigorous performance," but after a buyer purchased it, the buyer discovered it was missing a number of parts needed to make it operable.  Id.  The car dealer argued that even if he made a misrepresentation, he did so unintentionally because he never inventoried the parts

and did not know any parts were missing.  Id. at 170.  Indeed, the car dealer admitted he had never driven or even examined the car.  Id. at 169.  The New Hampshire Supreme Court found the car dealer liable, distinguishing his "rather cavalier attitude" from the Kelton horse seller's "good faith mistake."  Id. at 171. The Court held that the car dealer's "reckless disregard for the truth of his statements satisfie[d] the degree of knowledge or intent required by Kelton."  Id. The court found that a violation under either section V or VII would be proven on these facts.  Id. at 169.

In sum, then, a party violates 358-A:2, V & VII if it: (1) represents the goods or services are of a particular standard, quality, or grade when they are of another (or have characteristics they do not have), (2) knows the representation is false or has a reckless disregard for its truth, and (3) does so with the intent to induce consumers to buy the product.  See Beer, 160 N.H. at 168; McNeal, 157 N.H. at 469; Kelton, 155 N.H. at 668; see also D'Pergo, 561 F. Supp. 3d at 122; Brace, 2011 WL 635299, at *3.

Turning to Guay's case, Sig Sauer's relevant representation is the "Safety Without Compromise" notice that Guay read on Sig Sauer's website before purchasing his P320 in December 2016.  In that notice, Sig Sauer promised that the P320 "won't fire unless you want it to."  A reasonable consumer would, at the very least, understand this warranty as guaranteeing that the P320 would not fire without the user intentionally pulling the trigger.  The court has found that Guay's

pistol fired without him pulling the trigger.  Sig Sauer, therefore, represented the P320 was of one quality when it was of another.  See RSA 358-A:2, V & VII.

The question, then, is whether Sig Sauer knew the representation was false or had a reckless disregard for its truth.  As an initial matter, Toner testified that Sig Sauer tested the P320's safety mechanisms under the applicable industry safety procedures, and that the P320 satisfied the relevant standards.  There is no evidence to the contrary.

The strongest evidence introduced at trial that Sig Sauer knew or should have known that the P320 could potentially fire without an intentional trigger pull is the Roscommon incident.  Even under Sig Sauer's theory of the Roscommon incident (i.e., the seatbelt caused the gun to fire), Officer Richardson did not "want" his P320 to fire and did not intentionally pull the trigger.  However, there was no evidence introduced at trial to show that Sig Sauer was aware of the Roscommon incident at the relevant time: in December 2016, when Guay purchased his P320 in reliance upon the advertisement.  The evidence only established that Sig Sauer had seen the Roscommon video by January 10, 2019, more than three years after Guay purchased his gun.

If Sig Sauer had, in fact, known about the Roscommon incident—or any of the other alleged instances of the P320 firing without a trigger pull—before December 2016, then that knowledge may establish reckless disregard for the truth of the "Safety Without Compromise" advertisement.  But, given that Guay has not shown that Sig Sauer had any knowledge of any potential defect with the P320 prior to

December 2016, he has not shown that Sig Sauer knew the advertisement was false (or had a reckless disregard for the truth) of that advertisement.

## CONCLUSION

In sum, Guay has not met his burden to prove that Sig Sauer violated either RSA 358-A(2)(V) or 358-A(2)(VII).[4]

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 8, 2022

cc: Counsel of Record

---

[4] To the extent consistent with this order, the court grants the parties' proposed findings of fact and rulings of law on the CPA claim (doc. nos. 84 & 85). To the extent they are inconsistent, the court denies them.